## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No. ___3:20-cv-00882-MGL |
| SCANA CORPORATION, | Jury Trial Demanded |
| DOMINION ENERGY SOUTH CAROLINA, INC. (f/k/a SOUTH CAROLINA ELECTRIC & GAS COMPANY), | |
| KEVIN B. MARSH, and | |
| STEPHEN A. BYRNE, | |
| Defendants. | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC" or "Commission") alleges as follows:

### SUMMARY OF ACTION

1.      This case arises out of a historic securities fraud perpetrated by senior executives at SCANA Corporation and its subsidiary South Carolina Electric & Gas Company ("SCE&G") (jointly referred to as "SCANA").  SCANA and its senior executives repeatedly deceived investors, regulators, and the public over several years about the status of a $10 billion nuclear energy project.  When the truth was revealed, it resulted in hundreds of millions of dollars in losses to SCANA's investors and to South Carolinians.

2.      The project at issue was the failed expansion of the Virgil C. Summer Nuclear Station in Jenkinsville, South Carolina ("V.C. Summer").  The planned expansion at V.C. Summer was one of the largest and most expensive construction projects in South Carolina history.  The project began in 2008 when SCANA, which already operated one nuclear unit at V.C. Summer (Unit 1), announced its intention to build two new nuclear units at the plant (Unit 2 and Unit 3).  SCANA began constructing the new units in 2013, but the project was plagued by substantial delays and cost overruns.  In July 2017, these problems were so pervasive that after five years of planning and development, four years of construction, and a total of $9 billion expended, SCANA abandoned the project without completing either new nuclear unit.

3.      From 2015 through 2017, construction of the new nuclear units at V.C. Summer was a tale of two projects.  Publicly, SCANA touted progress being made on the project in its periodic filings with the SEC, on earnings calls with financial analysts, in press releases and video presentations, and in filings and testimony before the South Carolina Public Service Commission ("PSC").  These false statements enabled SCANA to bolster its stock price, sell $1 billion in corporate bonds at favorable rates, and obtain regulatory approval to charge its customers more than $1 billion in increased rates to help finance the project.  Internally, however, SCANA knew that – contrary to its public statements – the project was significantly delayed, the construction schedule was unreliable and unachievable, and the company was unlikely to qualify for $1.4 billion in federal production tax credits because the new units would not be completed by the January 1, 2021 deadline for receiving the tax credits.  SCANA and its senior management knew that the expansion project was not viable without those tax credits.

4.      SCANA's senior management, including Defendants Kevin B. Marsh ("Marsh") and Stephen A. Byrne ("Byrne"), were at the center of this fraud.  Marsh was the Chief

Executive Officer of SCANA and the Chairman of the Board of Directors for SCANA

Corporation and SCE&G.  He was directly involved in overseeing the expansion project at V.C.

Summer.  Byrne was SCANA Corporation's Executive Vice President and SCE&G's President

of Generation and Transmission and Chief Operating Officer.  Byrne's responsibilities included

overseeing all nuclear operations for SCANA, including construction of the new nuclear units at

V.C. Summer.  As such, Marsh and Byrne were well aware of the delays in the project, the ongoing

problems with the schedule, and the likelihood that SCANA would not qualify for the tax credits.

5.      Construction on the new nuclear units began in March 2013.  SCANA initially

projected that Unit 2 would be completed by 2016 and Unit 3 would be completed by 2019.  As

early as September 2013, however, the construction schedule was already delayed significantly.

Those delays continued throughout 2014.

6.      By 2015, Westinghouse Electric Company ("Westinghouse") – the lead contractor

on the project – had revised its schedule to have Unit 2 completed by June 2019 and Unit 3

completed by June 2020.  SCANA's senior management knew, however, that the project was

substantially behind even this revised schedule, that the revised schedule was unreliable, and that

SCANA was unlikely to qualify for the federal production tax credits.

7.      In fact, SCANA's nuclear team, which Byrne oversaw, wrote in a memorandum

dated April 28, 2015: (i) Westinghouse "has no credibility for developing a realistic schedule;"

(ii) SCANA has "no confidence in [Westinghouse's] ability to complete Unit 3 by the end of

2020 and suspects that production tax credits are in jeopardy for that unit;" and (iii) "[t]he

continued failure to meet schedule (Unit 2 now at least 39 months late, and Unit 3 at least 18

months late . . . ) has severely impacted credibility and has placed ongoing regulatory and

financial support in jeopardy."  At that time, SCANA's senior management also knew that at the

current rate of progress only 30% of the project would be completed by 2020.

8.    Despite knowing that the schedule was unreliable and the tax credits were at risk, SCANA's senior management publicly touted the construction schedule and the company receiving $1.4 billion in federal tax credits for the expansion project.  For example, just two days after receiving the above memorandum, Byrne misleadingly stated on SCANA's first quarter earnings call that "the [revised] construction schedule . . . includes a substantial completion date of June of 2019 for Unit 2 and June of 2020 for Unit 3."  Also, in May 2015, Byrne falsely testified before the PSC (SCANA's regulator):  "I can affirm that these schedules represent the best and most definitive forecast of the anticipated costs and construction schedule required to complete this project that is available[.]"  Marsh also testified before the PSC that the "current schedules reflect the best information available about the anticipated costs and construction timetables for completing the project," even though he knew those statements were not true.

9.    Later in 2015, given the significant delays that had occurred to date, SCANA retained Bechtel Power Corporation ("Bechtel") to conduct a third-party assessment of the project.  In October 2015, Bechtel presented its initial findings to SCANA's senior management, including Marsh and Byrne.  Bechtel stated that even under the best case scenario Unit 2 would not be completed until between December 2020 and August 2021 and Unit 3 would not be completed until between June 2022 and June 2023.  These projections meant that SCANA would likely not qualify for some, or perhaps any, of the $1.4 billion federal tax credits.  Bechtel also concluded that SCANA's schedule for completing the expansion project was unrealistic.

10.    SCANA and its senior management concealed the fact that the construction schedule was unreliable and that the company likely would not qualify for some, or perhaps any, of the $1.4 billion in tax credits.  Indeed, throughout the duration of the project, SCANA's senior

management, including Marsh and Byrne, failed to disclose these facts publicly.

11.    Instead, in October 2015, SCANA announced that it had entered into an amended agreement with Westinghouse and claimed that the new agreement resolved most of the problems with the project.  Despite Bechtel's finding that the completion of Unit 2 and Unit 3 would be delayed by 18 months to 3 years, however, the amended agreement moved the completion dates for the new units back by just 60 days.  Less than one month after receiving Bechtel's findings, SCANA's senior management, including Marsh and Byrne, testified before the PSC regarding the amended agreement.  Their testimony contradicted what they had recently been told by their own nuclear team and Bechtel.

12.    The nuclear expansion project fell even further behind schedule in 2016.  As SCANA's nuclear team stated to SCANA's senior management, including Marsh and Byrne:  "It would be a good idea to encourage and recognize meaningful progress and successes.  This is difficult to accomplish when the project is not seeing meaningful successes."

13.    Despite the deteriorating status of the project, SCANA's senior management continued making false and misleading statements to the public regarding the construction schedule and the production tax credits.  For example, during SCANA's first quarter earnings call in April 2016, Byrne misleadingly touted significant progress being made on the project and presented several photographs of the construction site that purported to show that progress even though he knew the project had experienced additional delays.

14.    By the summer of 2016, the nuclear expansion project at V.C. Summer had fallen even further behind schedule.  On July 26, 2016, Byrne made a presentation at SCANA's Board of Director's meeting that recognized substantial problems in "Five Project Focus Areas."  Byrne stated in the presentation, which was attended by Marsh:  "The majority of project milestones are

not met on their scheduled dates.  The percentage of schedule activities completed on time is well below the goal and does not allow for a reliable Integrated Project Schedule."

15.    On SCANA's second quarter earnings call just two days later, however, Byrne falsely stated: "The guaranteed substantial completion dates remain at August of 2019 for unit 2 and August of 2020 for unit 3.  We don't see anything to change those."  Byrne's false statements had the desired effect, as analysts issued reports emphasizing the confidence SCANA's senior management had in completing Unit 2 and Unit 3 in time to qualify for the production tax credits.

16.    By the end of 2016, SCANA and its senior management knew that the project was hopelessly behind schedule, that the schedule from Westinghouse was unrealistic, and that the company would not qualify for the federal production tax credits.  Despite this knowledge, SCANA's senior management kept making false and misleading statements regarding the reliability of the construction schedule and the receipt of the tax credits.

17.    The nuclear expansion project at V.C. Summer continued to experience severe problems in 2017, and essentially collapsed in the middle of that year.  Westinghouse (the lead contractor on the project) declared bankruptcy, and SCANA determined that it would take several more years and require substantial additional funding to complete construction of the new nuclear units.  In July 2017, SCANA announced that it was abandoning the project, with construction of the new nuclear units not even being half complete.

18.    The failed nuclear expansion project at V.C. Summer had devastating consequences for SCANA's investors and customers.  Investors lost hundreds of millions of dollars when the truth was revealed.  SCANA's energy customers lost over $1 billion in higher rates that SCANA, which was a regulated monopoly, had been allowed to charge them to help recoup the significant financing costs associated with the nuclear expansion project.

6

19.     At least some executives at SCANA recognized the enormity of the fraud and the consequences that would follow.  A SCANA executive wrote to a colleague that the failed expansion project at V.C. Summer was due to "[e]go and un-attentiveness," and that the fallout was "[g]onna be a blood letting the likes of which we have never seen."  The SCANA executive concluded:  We "got on our jet airplanes and flew around the country showing the same damn construction pictures from different angles and played our fiddles while the whole mf [sic] was going up in flames."

20.     By engaging in the conduct alleged in this Complaint, Defendants SCANA Corporation, Dominion Energy South Carolina, Inc. (f/k/a SCE&G), Marsh, and Byrne (collectively "Defendants") violated and/or aided and abetted violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  In addition, Defendants SCANA Corporation and Dominion Energy South Carolina (f/k/a SCE&G) violated, and Defendant Marsh aided and abetted the violations of, Section 13(a) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].  Finally, Defendant Marsh violated Rule 13a-14 [17 C.F.R. § 240.13a-14].

## JURISDICTION AND VENUE

21.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties, disgorgement plus

prejudgment interest, an officer and director bar, and for other equitable relief.

22.     The Court has jurisdiction over this action under Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

23.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27(a) of the Exchange Act [15 U.S.C. § 78a(a)].

24.     A substantial part of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred within the jurisdiction of the United States District Court for the District of South Carolina (Columbia Division), including but not limited to fraudulent acts being committed and fraudulent statements being made by Defendants in this judicial district.  In addition, Defendants SCANA Corporation and Dominion Energy South Carolina, Inc. have their principal places of business in this judicial district, and Defendants Marsh and Byrne reside in this judicial district.

25.     Defendants, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.  Defendants, unless enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged herein, and in transactions, acts, practices, and courses of business of similar purport and object.

## DEFENDANTS

26.     **SCANA Corporation** is a South Carolina corporation engaged, through subsidiaries, in electric and natural gas utility operations and other energy-related businesses. SCANA Corporation's principal place of business is located in Cayce, South Carolina.  At all relevant times, SCANA Corporation's securities were registered under Section 12(b) of the

Exchange Act, it was a reporting company subject to the provisions of Section 13(a) of the Exchange Act, and its stock was traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SCG." In addition, SCANA Corporation was a regulated monopoly in South Carolina. In January 2019, SCANA Corporation was acquired by Dominion Energy, Inc. ("Dominion"), with SCANA Corporation continuing as a surviving corporation and a wholly owned subsidiary of Dominion.

27.    **Dominion Energy South Carolina, Inc. (f/k/a/ South Carolina Electric & Gas Company) ("SCE&G")** is a wholly owned SCANA subsidiary and regulated public utility engaged in the generation, transmission, distribution, and sale of electricity primarily in South Carolina. SCE&G's securities were registered under Section 12(g) of the Exchange Act during the relevant time period and it filed with the Commission combined annual and quarterly reports with SCANA Corporation. After the merger, SCE&G's name was changed to Dominion Energy South Carolina, Inc., but it remains a wholly owned subsidiary of SCANA Corporation operating as a public utility. Dominion Energy South Carolina, Inc. will be referred to as SCE&G in this Complaint. The company's principal place of business is located in Cayce, South Carolina. Its securities are registered under Section 12(g) of the Exchange Act and it files independent periodic reports with the Commission pursuant to Section 13(a) of the Exchange Act. In this Complaint, "SCANA" refers to SCANA Corporation and SCE&G collectively.

28.    **Kevin B. Marsh**, age 64, is a resident of Irmo, South Carolina. He received a B.B.A. degree in Accounting from the University of Georgia. Marsh joined SCANA in 1984 and, over the next 27 years, held various officer positions, including Chief Financial Officer and Chief Operating Officer. From December 2011 until December 2017, Marsh served as the Chief Executive Officer of SCANA Corporation and SCE&G and Chairman of the SCANA

Corporation and SCE&G Board of Directors.  As the CEO of SCANA, Marsh's responsibilities included overseeing the nuclear expansion project at V.C. Summer, and he was personally involved in the project.  Marsh received substantial compensation while working at SCANA, including millions of dollars in bonuses during the relevant time period.  Marsh's compensation and bonuses were tied, at least in part, to his oversight of the expansion project at V.C. Summer.

29.    **Stephen A. Byrne**, age 59, is a resident of Isle of Palms, South Carolina.  Byrne received a B.S. degree in Chemical Engineering from Wayne State University.  He joined SCE&G in 1995 as the Plant Manager at the V.C. Summer plant, and he later became the company's Chief Nuclear Officer.  From 2012 until January 2018, Byrne was an Executive Vice President of SCANA and President of Generation and Transmissions and Chief Operating Officer of SCE&G.  His responsibilities included overseeing all nuclear operations for SCANA, including construction of the two new nuclear units at V.C. Summer.  Byrne received substantial compensation while working at SCANA, including millions of dollars in bonuses during the relevant time period.  Byrne's compensation and bonuses were tied, at least in part, to his oversight of the expansion project at V.C. Summer.  Byrne reported to Marsh.

### OTHER RELEVANT ENTITIES

30.    **Dominion Energy, Inc.**, is a Virginia corporation and one of the nation's largest producers and transporters of energy.  Dominion's securities are registered with the Commission under Section 12(b) of the Exchange Act and its stock trades on the NYSE under the ticker symbol "D."  As of February 2020, Dominion's market capitalization exceeded $70 billion.

31.    **The South Carolina Public Service Commission** is a publicly elected executive board that regulates utility rates in South Carolina.  The PSC regulated the rates that SCANA charged its approximately 700,000 electricity customers in the state and also regulated the fixed

assets that were invested in SCANA's business so that utility service could be provided to the company's customers. During the relevant time period, the PSC held public hearings on SCANA's rate petitions and also maintained a website where many of the false and misleading statements made to the regulatory body were accessible by the public.

32.    **Office of Regulatory Staff** ("ORS"), is South Carolina's public utility oversight agency that had the dual mission of representing the public interest of South Carolina in utility regulation and at the same time advancing the interests of utilities in the state. ORS periodically reported to the PSC on the V.C. Summer expansion project.

33.    **South Carolina Public Service Authority** (a/k/a Santee Cooper) is a state-owned public utility that provides electricity to customers in South Carolina. Santee Cooper's principal place of business is Moncks Corner, South Carolina.

### FACTS

**SCANA's Nuclear Expansion Project at V.C. Summer**

34.    In 2005, SCANA concluded that to meet the future energy demands of its customers the company needed to increase its base load generation capacity – *i.e.*, it would need to generate more power. SCANA sought proposals from various nuclear generation construction firms on the best way to meet the energy needs of its customers over the coming decades.

35.    After considering various proposals, in May 2008, SCANA and Santee Cooper agreed to build two new 1,117-megawatt AP1000 Advanced Passive Safety Power Plants as part of an expansion of the V.C. Summer Nuclear Station located in Jenkinsville, South Carolina.

36.    SCANA and Santee Cooper split ownership of the expansion project, with SCANA taking a 55% ownership stake and Santee Cooper taking the remaining 45% share. SCANA's majority ownership stake allowed it to control the daily operations and management

of the expansion project at V.C. Summer.

37.     SCANA already had an existing nuclear unit in operation at V.C. Summer known as Unit 1.  The two new nuclear units were known as Unit 2 and Unit 3.

38.     SCANA selected Westinghouse Electric Company to be the lead contractor on the project.  On May 23, 2008, SCANA signed an Engineering, Procurement, and Construction agreement with Westinghouse ("EPC Agreement").  In this Complaint, "Westinghouse" refers to Westinghouse Electric Company and the other companies working with it on the expansion project.

39.     Westinghouse agreed to design, engineer, and construct the new nuclear units. The EPC Agreement provided that Unit 2 would be completed by April 1, 2016, and Unit 3 would be completed by January 1, 2019.  The new units had a life expectancy of sixty years.

40.     The total cost for the nuclear expansion project at V.C. Summer was originally estimated at $9.8 billion.  SCANA's share of the cost (55%) was approximately $5.4 billion and Santee Cooper's share of the cost (45%) was approximately $4.4 billion.

41.     The nuclear expansion project at V.C. Summer was the largest capital project undertaken in SCANA's history.

42.     At the time, SCANA had approximately $12 billion in assets, $4.2 billion in annual revenues, and a market capitalization of around $4.5 billion.

43.     SCANA was unable to finance directly the enormous costs of the nuclear expansion project.  Instead, SCANA relied on a South Carolina law called the Base Load Review Act ("BLRA") to help offset the costs of the project.

44.     The BLRA enabled SCANA to apply to the PSC (its regulator) for permission to raise rates on its customers to recoup the cost of capital associated with construction of the new

units.  SCANA was able to charge its customers over $1 billion in higher rates over the course of the project.  SCANA's customers had to pay the higher rates because SCANA is a monopoly.

45.     The BLRA provided, however, that SCANA could be held responsible for any costs that were incurred "imprudently."  Specifically, if the PSC determined that SCANA had not prudently managed the nuclear expansion project, the PSC could disallow the recovery of increased rates from the company's customers.

46.     The BLRA also required SCANA to submit detailed information to the PSC to justify any additional rate increases on its customers.  Among other information, the BLRA required SCANA to file quarterly reports that detailed the progress of construction on the new nuclear units, the costs of the project, and the scheduled completion dates for the new units.  SCANA regularly published the BLRA Quarterly Reports on its website.

47.     In addition to the PSC, the ORS also regulated SCANA.  The ORS is empowered to audit, inspect, and examine public utilities within the state, including SCANA.

48.     The ORS's audit function included both financial matters and construction progress related to the expansion project at V.C. Summer.  In particular, under the BLRA, the ORS was charged with conducting ongoing monitoring of the construction of the new nuclear units and the expenditure of capital on the project.

49.     On May 30, 2008, SCANA submitted a petition to the PSC under the BLRA.  SCANA requested that the PSC approve a Base Load Review Order to construct and operate the two new units at V.C. Summer.  Byrne submitted testimony in support of SCANA's petition.

50.     In approving SCANA's petition, the PSC noted that the "definitive substantial completion deadlines for Unit 2 and 3 [were] April 1, 2016 and January 1, 2019."

51.     The PSC also noted that "[o]ne important consideration concerning the

reasonableness and prudence of the construction plan is how [SCANA] intends to oversee that construction to protect its interests and the interests of its customers." In its approval order, the PSC specifically referenced Byrne's testimony that SCANA would provide comprehensive oversight of the expansion project. The PSC also made clear that, given the enormous costs of constructing Unit 2 and Unit 3, it was imperative that SCANA prudently manage the project.

52.     The costs of constructing the new nuclear units were not covered by the BLRA. To help pay for the construction of Unit 2 and Unit 3, SCANA sold $1 billion in first mortgage bonds ($500 million in May of 2015 and another $500 million in June of 2016).

**Federal Production Tax Credits**

53.     In enacting the Energy Policy Act of 2005, Congress established production tax credits to incentivize the construction of new nuclear facilities in the United States. The tax credits were limited to the first 6000 megawatts of new nuclear capacity, and were structured to offset the high costs of starting a new nuclear facility over the first eight years of operation.

54.     To qualify for the production tax credits, newly constructed nuclear units had to be producing power by January 1, 2021.

55.     As a result of the Energy Policy Act, SCANA would qualify for production tax credits estimated at $85,937,500 annually per unit, or $1.4 billion in total, over 8 years. SCANA would only receive these production tax credits, however, if Unit 2 and Unit 3 were completed by January 1, 2021. SCANA would not qualify for the federal production tax credits if the new units were not completed by January 1, 2021.

56.     SCANA's receipt of the production tax credits for both Unit 2 and Unit 3 was a core component of SCANA's strategic vision and business model. SCANA touted the importance of receiving the production tax credits to maintaining regulatory and financial

support for the nuclear expansion project.  In fact, SCANA described the receipt of production

tax credits as a "strategic imperative" for the company.  At all relevant times, SCANA's ability

to receive the production tax credits was important to investors as well as other members of the

financial community because the funds would mitigate the costs that rate payers would bear for

the project and, in turn, SCANA would maintain a supportive regulatory environment that

allowed it to raise rates.  SCANA's receipt of the tax credits was also important to the PSC,

which directed SCANA to complete Unit 2 and Unit 3 in time to receive the federal tax credits.

57.    SCANA and its senior executives, including Marsh and Byrne, knew the

importance of the company qualifying for and receiving the federal production tax credits to the

viability of the nuclear expansion project at V.C. Summer.

**The Expansion Project Experiences Significant Delays and Cost Overruns**

58.    Construction on the new nuclear units began in March 2013.

59.    As early as September 2013, it was apparent that the V.C. Summer expansion

project was already delayed significantly.  By that time, SCANA had submitted several update

petitions to the PSC to modify the original construction schedules and the completion dates for

Unit 2 and Unit 3.  SCANA requested that the PSC approve a revised schedule in which Unit 2

would be completed by March 15, 2017, and Unit 3 would be completed by May 15, 2018.

60.    The construction delays on the project continued throughout 2014.  By August

2014, Westinghouse had produced a new Revised, Fully Integrated Construction Schedule for the

project.  The new schedule had preliminary completion dates of late 2018 or the first half of 2019

for Unit 2.  Westinghouse indicated that it would complete Unit 3 twelve months later (*i.e.*, by late

2019 or the first half of 2020).

61.    SCANA's senior management, including Marsh and Byrne, knew about these

scheduling delays and Westinghouse's revised completion dates for Unit 2 and Unit 3.

**SCANA's Senior Management's Concerns That Westinghouse**
**Would Not Complete the New Nuclear Units by the Revised Dates**

62.    In light of the significant problems plaguing the project, SCANA and Santee

Cooper began contemplating an independent third-party assessment of the project.  On August 7,

2014, SCANA executives, including Marsh and Byrne, along with representatives from Santee

Cooper met with representatives from Westinghouse to discuss the scheduling delays.  At the

meeting, Byrne told Westinghouse that SCANA and Santee Cooper wanted an independent review

of the revised schedule performed because they questioned whether Westinghouse could complete

the new nuclear units by the revised dates.

63.    After further discussion, Westinghouse acknowledged that it would not meet the

2018 completion date for Unit 2.  Westinghouse claimed, however, that it could complete Unit 2

by June 2019 and Unit 3 by June 2020.

64.    SCANA's senior management, including Marsh and Byrne, doubted

Westinghouse's representations regarding the construction schedule and the reliability of that

schedule.  As Marsh noted in an earlier letter to Westinghouse:  "You have made promise after

promise, but fulfilled few of them."

65.    On December 10, 2014, Marsh and Byrne met with representatives from

Westinghouse.  According to Byrne's notes from the meeting, Byrne told the representatives from

Westinghouse that he did not have confidence in their schedule for completing Unit 2 and Unit 3

based on the history of delays on the project.

66.    On January 6, 2015, SCANA convened an internal meeting to discuss how to move

forward with Westinghouse on the project in light of the substantial delays in construction on Unit

2 and Unit 3.  Byrne attended the meeting and his notes reflect that Westinghouse was "not

16

meeting critical milestones to achieve June 2019" completion for Unit 2.

67.     Byrne was correct that Westinghouse was not meeting critical milestones on the project.  In fact, Westinghouse was chronically underperforming on constructing Unit 2 and Unit 3.  SCANA's senior management, including Marsh and Byrne, knew that Westinghouse failed month after month to meet various performance metrics that measure the site's efficiency and progress and indicated whether the project could (or would) be completed under the established schedule.

68.     The main metric for showing whether the project would be completed in accordance with the schedule and in time for SCANA to receive the production tax credits was the "overall construction complete" and the "monthly percent complete."  This number was generated by taking how much construction work had been completed on the project and then dividing the remaining balance of work to be done by the number of months outstanding prior to the scheduled completion date (or the production tax credit deadline of January 1, 2021).

69.     The main metric for measuring construction site efficiency was the performance factor, which is a ratio of actual time versus the planned amount of time labor spends doing a particular task.  A higher performance factor equates to less efficient labor.  For instance, a performance factor of 1.0 means that it took as many labor hours to complete a task as was planned.  A performance factor of 2.0 means that it took twice as many labor hours as were planned to complete a task.

70.     The revised schedule assumed that Westinghouse would achieve a performance factor of 1.15, even though Westinghouse had never achieved an efficiency level that low during the years that it had been working on the project.

71.     On January 7, 2015, SCANA executives, including Byrne, met again with representatives from Westinghouse.  According to Byrne's notes from the meeting, a

Westinghouse representative opened the meeting by stating that June 2019 and June 2020 were the most "realistic" completion dates for Unit 2 and Unit 3. A Westinghouse representative then asked whether SCANA believed the revised schedule for the new nuclear units was realistic. Byrne's own notes reflect that he answered, "No."

72.    On February 16, 2015, SCANA's senior executives, including Marsh and Byrne, met with representatives from Santee Cooper to discuss retaining an independent company to perform a third-party assessment of the project.

73.    By March 2015, the expansion project at V.C. Summer was even further behind schedule. For the last six months of 2014, the overall performance factor was around 1.8, and in January 2015 it was 1.5. By February 2015, the performance factor had increased to 2.37 – meaning that it was taking more than twice as many labor hours to complete a task as planned.

74.    The overall construction complete percentages were equally dismal, showing that only about 15% of the project was completed at that time and at the current rate of progress only about 30% of the project would be completed by July 2019.

75.    On March 6, 2015, SCANA and Santee Cooper executives attended a meeting regarding the lack of progress on completing construction of Unit 2 and Unit 3. At the meeting, they discussed the overall construction complete percentage and the performance factor, both of which showed that Westinghouse's revised schedule was not credible or achievable.

**SCANA's March 12, 2015 Petition to the PSC**

76.    SCANA filed a petition with the PSC on March 12, 2015, asking it to approve yet another revised schedule that had Unit 2 being completed by June 19, 2019, and Unit 3 being completed by June 16, 2020. SCANA's senior executives knew that this revised schedule was not reliable. SCANA's petition also anticipated increased costs of nearly $700 million.

77.     SCANA's petition falsely stated that "substantial progress has been made towards completion of the Units."  In terms of the tax credits, SCANA falsely wrote that:  "Based on the current construction schedules and assuming current tax law, [SCANA] anticipates that additional Federal Production Tax Credits will be available for the Units that will provide customers with $1.2 billion in additional benefits compared to projections made in 2008."

78.     In its petition, SCANA also falsely stated that "the Revised, Fully Integrated Construction Schedule and Revised Cash Flow Forecast presented here are based upon [its] most current review and analysis of the information provided."  In fact, SCANA's nuclear team, including Byrne and Marsh, knew that the revised schedule was not reliable.

79.     SCANA also emphasized that the company "has been able to obtain low-cost borrowing for project costs based on [its] favorable bond ratings and the low cost of financing available in debt markets" and that "customers are anticipated to save $1.2 billion in interest costs over the life of the debt[.]"

80.     SCANA's statements to the PSC, including its petitions, were made publicly available shortly after they were filed.  Investors viewed a supportive regulatory environment in South Carolina as important to maintaining SCANA's stock price and credit rating because a loss of support from the PSC would lead to elevated interest rates for SCANA's bonds and a drop in equity prices for SCANA.

81.     In addition, on March 12, 2015, SCANA filed a Form 8-K with the SEC announcing that it had submitted the petition with the PSC and attached a copy of the petition.  On the same day, SCANA published a press release that referred to the update petition and then misleadingly stated:  "The construction schedule reflected in the petition, without consideration of all mitigating strategies, indicates a substantial completion date for Unit 2 of June 2019 and a

substantial completion date for Unit 3 of June 2020." Marsh also misleadingly claimed that "[s]ubstantial progress has been made towards the completion of the units" and that SCANA "expect[s] more production tax credits" than the company initially thought it would receive.

82.    On March 30, 2015, SCANA's senior executives, including Marsh and Byrne, attended an internal Risk Management Committee meeting where it was decided that there was an "increased risk" that the company would not qualify for the federal tax credits because the new nuclear units might not be completed by January 1, 2021. SCANA and its senior executives did not disclose that information to the PSC or to investors.

83.    Instead, in SCANA's BLRA Quarterly Report for the quarter ending March 31, 2015, SCANA misleadingly touted that the "Revised, Fully-Integrated Construction Schedule provides a new substantial completion date for Unit 2 of June 19, 2019, and a new substantial completion date for Unit 3 of June 16, 2020." SCANA also falsely claimed that the company would "monitor closely . . . the cost and schedule for the project" and "will continue to update the [PSC] and the ORS of progress and concerns as the project proceeds." SCANA's BLRA Quarterly Report was made publicly available on its website shortly after it was filed.

### Defendants Make False Statements and Omit Material Information in SCANA'S First Quarter Earnings Call and Form 10-Q Filing

84.    On April 6, 2015, Byrne received an e-mail from Santee Cooper's Senior Vice President for Nuclear Energy regarding the schedule delays and cost overruns on the expansion project. The e-mail reiterated what had been discussed at the March 6 meeting and included several charts as attachments that visually depicted the lack of progress on the project.

85.    The e-mail noted that, in terms of cost, the attachments did not include a "total cost curve" chart because, based on the "actual numbers recorded on the project over the 5 month period (Sept 2014 – Jan 2015)," such a curve "would be off the chart."

86.    In terms of schedule, one of the charts made clear that the new units were nowhere close to being completed.  The chart showed that only around 15% of the project had been completed and that at the current rate of progress only 30% would be completed by July 2019.

87.    Specifically, Byrne received the following chart entitled, "Percent Complete – Direct Craft Work."  The chart showed the percent of direct craft work (*i.e.*, skilled labor) that would be completed at the current rate of progress and the improvement that would be necessary to achieve the proposed June 2019 and June 2020 substantial completion dates ("SCDs") that SCANA had represented to the PSC.  The chart reflected that the new units would not be finished by the dates that SCANA had publicly touted:



88.    On April 21, 2015, Marsh attended a meeting with Santee Cooper.  Marsh's notes

from the meeting state that the "current pace won't achieve 2020."  Marsh was referring to the fact

that at the current rate of progress construction of the new units would not be completed in time for

SCANA to qualify for the federal production tax credits.

89.    In April 2015, Byrne was also involved in the preparation of a memorandum for an

upcoming meeting between the CEOs of SCANA and Santee Cooper.

90.    On April 28, 2015, Byrne received an e-mail from his nuclear team in preparation

for that meeting which included a "CEO Talking Points" memorandum as an attachment.  The

CEO Talking Points memorandum listed numerous "schedule concerns" that SCANA and Santee

Cooper had regarding the nuclear expansion project.

91.    Specifically, the memorandum stated:

- Westinghouse "has no credibility for developing a realistic schedule";

- Westinghouse "continues to fail on executing critical work path";

- "The cumulative direct craft productivity factor (PF) has gotten worse every month for the past two years";

- "In the last 2 years, less than 8% of direct work has been completed";

- "And despite the negative trend in craft productivity, in the next 4-1/2 years, 84% will need to be completed to meet the Jun 2019/June 2020 SCDs";

- SCANA and Santee Cooper have "no confidence in [Westinghouse's] ability to complete Unit 3 by the end of 2020 and suspect[] that production tax credits are in jeopardy for that unit"; and

- "The continued failure to meet schedule (Unit 2 now at least 39 months late, and Unit 3 at least 18 months late . . . ) has severely impacted credibility and has placed ongoing regulatory and financial support in jeopardy."

92.    The memorandum further stated that Westinghouse "has no credibility for developing a realistic cost estimate."

93.    In conclusion, the memorandum stated that "Production Tax Credits are at risk"; "Financing Costs are at risk for increasing"; and "BLRA rate recovery is at risk."

94.    When asked by a SCANA executive how these conclusions could be reconciled with SCANA's recent petition to the PSC, a member of SCANA's new nuclear team responded: "Respectfully, there is no way to comment on these talking points and remain consistent with the recent PSC filing.  This is more like a tale of two projects."

95.    On April 30, 2015, SCANA held its first quarter earnings call and webcast.  Byrne had received the "CEO Talking Points" memorandum just two days earlier.

96.    On the call, Byrne misleadingly stated that "[t]he construction schedule, without consideration of all mitigating strategies, includes a substantial completion date of June of 2019 for Unit 2 and June of 2020 for Unit 3."  At the time that Byrne made this statement, he knew that the construction schedule was unreliable and that neither Unit 2 nor Unit 3 would be completed by those dates at the current rate of progress.

97.    An analyst then asked Byrne, "what you might think might happen with nuclear PTCs.  I know you're coming up against the time clock . . . ."

98.    Byrne falsely responded:  "**We believe that, and I think it was outlined in our filings, that we will actually be qualifying for more production tax credits tha[n] we had originally anticipated in our original filing.  So that's a positive aspect.  And we will – we fully anticipate that [Westinghouse] will be able to bring the plants in by June of 2019 and June of 2020 for the second unit.**  So the production tax credits, and you qualify for them by having the plant in service by the end of 2020.  So while I am not satisfied with only having

about six months' margin, we do believe there are some opportunities, particularly on that trailing unit, or Unit 3, for us to bring that in a little bit earlier."  [Emphasis added].

99.    Byrne's statements in response to the analyst's question regarding the schedule and the production tax credits were false and misleading.  He knew that Westinghouse's schedule was not reliable and that SCANA likely would not qualify for some, or perhaps any, of the tax credits.

100.    In conjunction with the earnings call, SCANA prepared and released a PowerPoint presentation.  Byrne's name is listed on the first page and he referred to the PowerPoint presentation on the earnings call.

101.    The presentation references SCANA's March 2015 petition to the PSC, and falsely states that the "New In Service Dates" for Unit 2 is "June 19, 2019" and for Unit 3 is "June 16, 2020."

102.    SCANA posted the transcript from the earnings call and the PowerPoint presentation on its website.  In addition, investors were allowed to listen to the earnings call.

103.    On May 8, 2015, SCANA filed a Form 10-Q with the SEC.

104.    SCANA's Form 10-Q stated that the nuclear production tax credits "could total as much as approximately $1.4 billion."  SCANA failed to disclose that its new nuclear team, including Byrne and Marsh, knew that Westinghouse would not complete Unit 2 or Unit 3 in accordance with the revised schedule.

105.    SCANA's Form 10-Q further stated, falsely, that "Based on the above substantial completion dates provided by [Westinghouse] of June 2019 and June 2020 for Units 2 and 3, respectively, both New Units are expected to be operational and to qualify for the nuclear production tax credits; however, further delays in the schedule or changes in tax law could impact such conclusions."  At this time, SCANA and its senior management, including Marsh

and Byrne, knew that based on the current rate of progress the new nuclear units were not likely to be completed in time to qualify for the production tax credits. SCANA and its senior management, including Marsh and Byrne, also knew that there would be substantial additional delays and that the revised schedule was not reliable.

106.    SCANA's Form 10-Q omitted the true status of the nuclear expansion project, including the unreliability of the schedule and the serious doubts about the new units qualifying for the production tax credits.

107.    In accordance with Rule 13a-14 of the Exchange Act and Section 304 of the Sarbanes-Oxley Act, Marsh certified that he had reviewed the periodic filing and that it contained no untrue statements. Marsh knew that his certification was false and misleading.

108.    Similarly, Byrne knew that the information in SCANA's periodic filing was false and misleading. Nevertheless, on May 8, 2015, Byrne signed a sub-certification letter in connection with the filing that falsely stated he had "no knowledge of any fraud or suspected fraud affecting SCANA or SCE&G[.]" SCANA required this sub-certification before filing the Form 10-Q.

**SCANA Issues $500 Million in First Mortgage Bonds in May 2015**

109.    As a result of the BLRA and the increased rates approved by the PSC, SCANA was receiving substantial payments from ratepayers in South Carolina to help finance the nuclear expansion project.

110.    By 2015, however, SCANA's capital expenditures on the project were estimated at over $1 billion annually. The company needed additional funds to continue the project.

111.    On October 15, 2012, SCANA filed with the SEC an Automatic Shelf Registration statement on Form S-3ASR to register the sale of first mortgage bonds. The Form S-3ASR

registration statement incorporated by reference certain prior filings and all subsequently filed periodic reports filed by SCANA, including the periodic reports discussed in this Complaint. Marsh signed the Form S-3ASR.

112.    On or about May 19, 2015, SCANA issued $500 million in First Mortgage Bonds. The First Mortgage Bonds matured in June 2065 and had an interest rate of 5.10%.  Marsh and Byrne knew about the bond offering and the representations incorporated into the registration statement.

113.    SCANA's preliminary prospectus supplement for the First Mortgage Bonds incorporated by reference the company's recent Form 10-Q and its updated petition with the PSC. Those documents were materially misleading regarding the construction schedule and the likelihood that SCANA would qualify for the production tax credits.

114.    In addition, the preliminary prospectus supplement failed to disclose that SCANA and its senior executives, including Marsh and Byrne, knew that the construction schedule within the preliminary prospectus was unrealistic.

115.    SCANA's bonds were given an "A-" rating by Fitch Ratings, Inc. ("Fitch").  As one of its "key rating drivers," Fitch noted that "under the current schedule the substantial completion date of Unit 2 is June 2019 with the substantial completion of Unit 3 expected 12-months later."  Fitch further noted that the PSC's "approval of the [March 2015 petition] is critical to maintaining existing ratings" and that SCANA's "ability to fully recover future construction costs will be dependent on the PSC's assessment of its March 2015 petition."

116.    Fitch made clear that its A- bond rating rested on the "key assumption" that the PSC would approve SCANA's update petition.  Fitch also opined that "[w]hile not expected, any change in the BLRA process that affects the timeliness and amount of nuclear cost recovery

would adversely affect current ratings."

117.    SCANA ultimately sold the $500 million in First Mortgage Bonds.

118.    The funds raised by SCANA were used primarily for the nuclear expansion project at V.C. Summer.

119.    At this time, SCANA had a market capitalization of around $7.5 billion.

**Defendants Make False and Misleading Statements In Support of the PSC Petition**

120.    On May 26, 2015, SCANA submitted written testimony from its senior executives to the PSC in support of the update petition.  This testimony was publicly available shortly after it was filed and could be accessed from the PSC's website.

121.    In his written testimony, Marsh specifically referenced SCANA's recent bond offering, which had been made just one week earlier.  Marsh testified that selling all of the bonds required a "slight nudge upward in the interest rate to bring the book of potential buyers from $400 million to the expected $500 million."

122.    Marsh stated that, according to several investment banking firms involved in the transaction, "an important factor for many potential buyers was their concern over regulatory risk related to the current filing.  Bond buyers have options.  If bond buyers have concerns about [SCANA's] risk profile, it is often just as easy for them to buy bonds of companies that do not face such risks as to buy [SCANA's] bonds."  Marsh noted that the "market is becoming increasingly sensitive to [SCANA's] regulatory risk in the nuclear context" and that the "risk of losing market support for our financing plan is real."

123.    Marsh also explained that 2015-2017 was a "critical time" for SCANA's financing of the expansion project.  He said that "during this three year period, [SCANA] will not have the option of waiting out unfavorable conditions in the capital markets[.]"  Rather, "during this time, it

will be vitally important that [SCANA] maintain access to capital markets on favorable terms."

124.    In addition to talking about the recent bond offering, Marsh also testified about the construction schedule, falsely stating:  "The cost and construction schedules presented for approval here are no different from those approved in 2008 and in each update docket thereafter. In each case, the Company came before the Commission with the best information available concerning the anticipated construction schedule for completing the Units and the anticipated costs associated with that schedule."

125.    Marsh also falsely testified:  "In every case, both the cost and construction schedules presented and approved have been anticipated schedules for completing the Units . . . The current schedules [submitted in this update petition] reflect the best information available about the anticipated costs and construction timetables for completing the project . . . [SCANA] has 'approved' these updated schedules in the sense that it recognizes them to be the most accurate and dependable statements available of the anticipated construction schedule for completing the Units and the anticipated schedule of capital costs for completing the Units . . . [SCANA] has carefully reviewed the data provided by [Westinghouse] and verified its reasonableness."

126.    Marsh also testified falsely about SCANA's receipt of production tax credits:  "In 2008, [SCANA] anticipated its total benefit would be $1.06 billion gross of tax.  Now it appears that there will be a smaller number of competing utilities so that [SCANA] will receive a larger amount of credits.  Assuming that the current completion dates can be maintained, [SCANA's] forecasted benefit has increased by approximately $1.2 billion in future dollars since 2008."

127.    Byrne also provided false written testimony to the PSC regarding the status of the nuclear expansion project and the reliability of the construction schedule.

128.     Byrne falsely testified:  SCANA "determined in March 2015 that the cost and construction schedules as updated by [Westinghouse] through that time were in fact the anticipated schedules for completion of the project as envisioned by the BLRA."  Byrne went on to say, falsely, that the schedules "are reasonable and prudent schedules for completing the project [and] [t]hey should be approved."

129.     Byrne concluded by falsely stating:  "I can affirm that these schedules represent the best and most definitive forecast of the anticipated costs and construction schedule required to complete this project that is available as of the date of this filing of the testimony.  These updated costs are not in any way the result of imprudent management of the project by" SCANA.

130.     In reality, the current schedule before the PSC did not reflect the "best" or "most definitive" information available.  To the contrary, SCANA and its senior management knew that the revised schedule was unreliable and that, at the current rate of progress, the new nuclear units would not be completed in time to receive the production tax credits.  SCANA and its senior management also failed to disclose to the PSC that they and Santee Cooper had decided to have an independent third-party assessment performed in light of the schedule delays to date and the unreliability of what Westinghouse, the lead contractor, was telling them.

131.     In June 2015, SCANA's and Santee Cooper's nuclear teams prepared another "CEO Meeting Talking Points" memorandum for an upcoming meeting with Westinghouse.

132.     The memorandum stated that:  "Completion of the [Westinghouse] AP1000 design has been a significant project challenge affecting procurement and construction.  The incomplete design of the AP1000 has resulted in 3–4 years of inefficient (and very poor) site execution.  As a result, **[Westinghouse] has not been able to achieve success on any schedule or cost estimate to date.  These issues have created a significant question of [Westinghouse's] credibility**

**regarding the delivery of the project."** [Emphasis added].

133.    The memorandum further noted that the continued failure to meet milestones has placed the "regulatory and financial support in jeopardy" and, for SCANA, put the "production tax credits in jeopardy." **In short, SCANA and Santee Cooper had "little confidence in [Westinghouse's] ability to complete Unit 3 by the end of 2020."** [Emphasis added].

134.    In terms of cost, the memorandum noted that Westinghouse "has little credibility for developing a realistic cost estimate."

135.    On June 5, 2015, representatives from SCANA's nuclear team and Santee Cooper met with representatives from Westinghouse to discuss the status of the project. SCANA and Santee Cooper notified Westinghouse that they planned to have an independent third party evaluate the project.

136.    Marsh and Byrne knew of the planned third-party assessment, the reasons for requesting it, and that it was discussed with Westinghouse. In fact, they were both sent notes from the meeting. Neither Marsh nor Byrne, however, publicly disclosed the planned third-party assessment or that SCANA's nuclear team had concluded that Westinghouse's schedule was not reliable.

137.    Instead, SCANA filed a BLRA Quarterly Report for the period ending June 30, 2015, that touted the same unreliable construction schedule and made the same false and misleading statements regarding SCANA's oversight of the project and its candor with the PSC and the ORS as its earlier report.

138.    On July 21, 2015, the PSC held a public hearing on SCANA's update petition.

139.    Marsh testified that his pre-filed written testimony, with three minor exceptions, had not changed. Marsh went on to testify that he was "directly involved in the management and

oversight of the new nuclear project" and he reiterated that "the projected benefit for federal production tax credits . . . has increased by approximately $1.2 billion."

140.    In terms of the schedule, Marsh falsely testified:  "The schedule we have put before the Commission is a schedule we are working to, on site, now, to complete the units.  So we have agreed this is the working schedule to complete the units, as we presented to the Commission. . . . There is no dispute that this is the schedule upon which the plants are being built."  Marsh failed to disclose that he and other SCANA executives knew that the schedule was unreliable and that the company would not qualify for the production tax credits at the current rate of progress.

141.    In addition, Marsh testified:  "Nothing is more important to SCE&G's financial plan than maintaining market confidence and the continued application of the BLRA in a fair and consistent way.  Loss of this confidence would put the financial plan for completing the units at risk."  Marsh's testimony was available to the public.

142.    Byrne also testified at the July 21, 2015 PSC hearing.  He testified that his pre-filed written testimony had not changed.

143.    Byrne then testified, falsely, that:  "In March of 2015, [SCANA] determined that the updated costs and construction schedule from [Westinghouse and its sub-contractor] were, in fact, accurate schedules for completion of the project as envisioned by the BLRA. . . The costs and construction schedules submitted here are well reviewed, well documented, and reflect reasonable and accurate schedules for the project based on information to date.  They are not the result of imprudence by [SCANA] in any way.  As with any complex project, however, these schedules are likely to change; but based on current information, they are appropriate for approval as the new BLRA schedules for this project."  Byrne's testimony was available to the public.

144.    In September 2015, the PSC approved SCANA's update petition.  The PSC relied

on testimony from Marsh and Byrne in finding that the new schedule was "a reasonable and prudent plan for completing construction of the Units given the information available at this time."

145.    SCANA issued a press release announcing the PSC's decision.  In the press release, SCANA falsely stated that "[t]he construction schedule approved today, without consideration of all mitigating strategies, indicates substantial completion dates of June 2019 and June 2020 for Units 2 and 3, respectively."  SCANA also filed a Form 8-K on September 2, 2015, that included the press release as an attachment.

146.    On September 30, 2015, the PSC approved SCANA's revised rate petition, which the company had submitted shortly after issuing the $500 million in First Mortgage Bonds.  Specifically, the PSC granted SCANA a rate increase of over $64 million in annual retail revenue.

**Defendants Retain Bechtel, Disguise Hiring Bechtel From Regulators, and Then Contradict Bechtel's Findings in Public Filings and Testimony Before the PSC**

147.    On August 6, 2015, because of the significant delays that had occurred to date, SCANA, through its counsel, retained Bechtel Power Corporation to conduct an independent assessment of the nuclear expansion project at V.C. Summer.  Bechtel is an internationally known engineering, procurement, construction, and project-management company based in Virginia.  Bechtel has worked on mega-projects for over 80 years, including construction of the Hoover Dam in Nevada.

148.    Bechtel was paid $1 million for its assessment of the expansion project at V.C. Summer.

149.    Marsh and Byrne knew that Bechtel had been hired to evaluate the expansion project at V.C. Summer because the project was significantly behind schedule.

150.    Bechtel's field work and analysis took around two months to complete.  Bechtel's work included meeting with Byrne to discuss the expansion project.

151.    On August 7, 2015, SCANA filed a Form 10-Q with the SEC.

152.    SCANA's Form 10-Q stated that the nuclear production tax credits "could total as much as approximately $1.4 billion."  SCANA failed to disclose that its new nuclear team, including Byrne and Marsh, knew that Westinghouse would not complete Unit 2 or Unit 3 in accordance with the revised schedule and that the schedule was unreliable.  Nor did it disclose that SCANA had hired a third party to perform an independent assessment of the construction project as a result of the significant delays.

153.    SCANA's Form 10-Q further stated, falsely, that "Based on the above substantial completion dates provided by [Westinghouse] of June 2019 and June 2020 for Units 2 and 3, respectively, both New Units are expected to be operational and to qualify for the nuclear production tax credits; however, further delays in the schedule or changes in tax law could impact such conclusions."  At this time, SCANA and its senior management, including Marsh and Byrne, knew that the new nuclear units would not be completed in time to qualify for the production tax credits based on the current rate of progress.  SCANA and its senior management, including Marsh and Byrne, also knew that there would be substantial additional delays and that the revised schedule was not reliable.

154.    SCANA's Form 10-Q omitted the true status of the nuclear expansion project, including the unreliability of the schedule and the fact that SCANA would not qualify for the federal tax credits at the current rate of progress.

155.    In accordance with Rule 13a-14 of the Exchange Act and Section 304 of the Sarbanes-Oxley Act, Marsh certified that he had reviewed the periodic filing and that it contained no untrue statements.  Marsh knew that his certification was false and misleading.

156.    Byrne also knew that the information in SCANA's periodic filing was false and

misleading.  Nevertheless, on August 7, 2015, Byrne signed a sub-certification letter in connection

with the filing that falsely stated he had "no knowledge of any fraud or suspected fraud affecting

SCANA or SCE&G[.]"  SCANA required this sub-certification before filing the Form 10-Q.

157.    By October 2015, Bechtel was ready to discuss key observations from its study

with SCANA and Santee Cooper.  At that time, construction on Unit 2 and Unit 3 was still

significantly behind schedule and had been falling further behind schedule each month.

158.    As one SCANA nuclear construction manager put it:  **"Basically, not a single

schedule mitigation has worked."**  Another SCANA nuclear finance manager noted that at the

current rate of progress **"it would take 22 years to complete the plants."**  [Emphasis added].

159.    On October 22, 2015, Bechtel met with senior executives from SCANA to present

orally its findings.  Marsh and Byrne attended the presentation, which included a PowerPoint

presentation by Bechtel entitled, "Preliminary Results of Bechtel Assessment."

160.    Bechtel's presentation included several highly critical findings regarding the

project schedule and SCANA's management of the project.

161.    Bechtel found that SCANA and its executives were not prudently managing the

project.  Specifically, Bechtel wrote:  "The oversight approach taken by [SCANA and Santee

Cooper] does not allow for real-time, appropriate cost and schedule mitigation."  Bechtel further

noted that SCANA and Santee Cooper "do not have an appropriate project controls team to

assess/validate [Westinghouse's] reported progress and performance."

162.    Bechtel made several recommendations on how SCANA could improve its

oversight of the project.

163.    In terms of schedule, Bechtel found that "the current schedule is at risk" and that

"[t]o-go scope quantities, installation rates, productivity, and staffing levels all point to

completion later than current forecast."

164.    Bechtel's preliminary results indicated that Unit 2, which was currently scheduled to be completed by June 2019, would not be completed until between December 2020 and August 2021 (*i.e.*, 18 to 26 months later than scheduled).

165.    Bechtel found that Unit 3, which was scheduled to be completed by June 2020, would not be completed until between June 2022 and June 2023 (*i.e.*, 24 to 36 months later than scheduled).

166.    These revised dates left only a small, one month window for Unit 2 to qualify for the production tax credits.  Unit 3 would not be completed in time to qualify for the tax credits.

167.    Significantly, the revised completion dates in Bechtel's presentation reflected a best case scenario for SCANA that assumed implementation of Bechtel's recommendations and significant improvement in the rate of construction.

168.    Bechtel further observed that Westinghouse's "forecasts for schedule durations, productivity, forecasted manpower peaks, and percent complete do not have a firm basis."

169.    In conclusion, Bechtel found that "the V.C. Summer Units 2 and 3 project suffers from various fundamental [engineering, procurement, and construction] and major project management issues that must be resolved for project success."

170.    Marsh's notes from the meeting include the delayed completion dates for Unit 2 and Unit 3 that would make the units ineligible for the tax credits under the Energy Policy Act. His notes also reflect that the actual monthly progress achieved on the project was a fraction of the progress needed to complete the new units in time to qualify for the tax credits.

171.    On October 27, 2015, just five days after Bechtel presented its findings to SCANA, SCANA filed a Form 8-K with the Commission and issued a press release announcing an

amendment to the existing EPC Agreement ("EPC Amendment"). Neither the Form 8-K nor the press release disclosed the true status of the project.

172.     Instead, despite Bechtel's finding that the completion of Unit 2 and Unit 3 would be delayed by 18 months to 3 years, SCANA announced that the EPC Amendment revised the contractual Guaranteed Substantial Completion Dates ("GSCD") for the new nuclear units by just two months – to August 31, 2019 for Unit 2 and August 31, 2020 for Unit 3.

173.     SCANA and its senior executives, including Marsh and Byrne, did not want Bechtel's findings to be made publicly available, and the company went to great lengths to hide those findings and the true status of the project from the ORS, PSC, and investors.

174.     SCANA, in publicizing the EPC Amendment, which was also attached to SCANA's Form 10-Q for the third quarter of 2015, did not disclose that the schedule contained in the amended agreement was unreliable and unachievable. SCANA also failed to disclose this information in its BLRA Quarterly Report for the period ending September 30, 2015.

175.     In addition to revising the schedule, SCANA stated that the EPC Amendment resolved the outstanding disputes between SCANA and Westinghouse, and included a provision for liquidated damages in the event that Westinghouse failed to complete the project in time for SCANA to qualify for the production tax credits. The total liquidated damages for SCANA and Santee Cooper were capped at $463 million per new unit, however, with SCANA's portion being approximately $255 million per new unit.

176.     Several assumptions regarding construction progress and performance metrics were known by SCANA to be necessary to achieve the new completion dates of August 2019 and August 2020, including a performance factor of 1.15 and a percent complete of 3% per month. SCANA's senior management, including Marsh and Byrne, knew the importance of these metrics

and that Westinghouse was nowhere close to achieving either of them.

177.    Additionally, the EPC Amendment included an option (known as the "fixed price option") whereby SCANA and Santee Cooper could elect to proceed with the project at a set price going forward.  If SCANA elected the fixed price option, however, the liquated damages would be reduced to $186 million per unit (or $372 million for both units).

178.    Bechtel told Marsh that it was close to issuing a written report outlining their findings and recommendations.  Marsh asked Bechtel to hold off on finalizing the report and, ultimately, asked that Bechtel send the report to SCANA's outside counsel.

179.    On November 6, 2015, SCANA filed a Form 10-Q with the SEC.

180.    SCANA's Form 10-Q stated that the nuclear production tax credits "could total as much as approximately $1.4 billion."  SCANA failed to disclose, however, that its new nuclear team, including Byrne and Marsh, knew that Westinghouse would not complete Unit 2 or Unit 3 in accordance with the revised schedule and that the company would not qualify for the tax credits at the current rate of progress.

181.    SCANA's Form 10-Q further stated, falsely, that "[b]ased on the guaranteed substantial completion dates provided above [August 2019 and August 2020], both New Units are expected to be operational and to qualify for the nuclear production tax credits; however, further delays in the schedule or changes in tax law could impact such conclusions."  At this time, SCANA and its senior management, including Marsh and Byrne, knew that based on the current rate of progress the new nuclear units would not be completed in time to qualify for the production tax credits.  SCANA and its senior management, including Marsh and Byrne, also knew that there would be substantial additional delays and that the revised schedule was not reliable.

182.    SCANA's Form 10-Q omitted the true status of the nuclear expansion project, including the unreliability of the schedule and that the new units were unlikely to qualify for the production tax credits.

183.    In accordance with Rule 13a-14 of the Exchange Act and Section 304 of the Sarbanes-Oxley Act, Marsh certified that he had reviewed the periodic filing and that it contained no untrue statements.  Marsh knew, however, that his certification was false and misleading.

184.    Similarly, Byrne knew that the information in SCANA's periodic filing was false and misleading.  Nevertheless, on November 6, 2015, Byrne signed a sub-certification letter in connection with the filing that stated he had "no knowledge of any fraud or suspected fraud affecting SCANA or SCE&G[.]"  SCANA required this sub-certification before filing the Form 10-Q.

185.    A week later, on or about November 12, 2015, Bechtel detailed its findings in a draft Project Assessment Report (the "Draft Bechtel Report").

186.    The Draft Bechtel Report was highly critical of SCANA's management of the project, concluded that the stated completion dates of June 2019 (Unit 2) and June 2020 (Unit 3) were not going to be achieved, and found that Westinghouse's "plans and schedules are not reflective of actual project circumstances."

187.    The Draft Bechtel Report stated, in short, that "the to-go scope quantities, installation rates, productivity, and staffing levels all point to project completion later than the current forecast."

188.    The Draft Bechtel Report concluded that, even if their recommendations were adopted, Unit 2 would not be completed until between December 2020 and August 2021 and Unit 3 would not be completed until between June 2022 and June 2023.  In other words, neither

38

Unit 2 nor Unit 3 would be completed until at least 18 months to 3 years later than SCANA and

its executives, including Marsh and Byrne, were telling the PSC and investors. In addition,

Bechtel's assessment meant that SCANA would not qualify for some, and may not qualify for

any, of the $1.4 billion in federal production tax credits.

189.    On November 12, 2015, outside counsel for SCANA instructed Bechtel that it

was "extremely important" that Bechtel "hold the final report" until he had reviewed it.

190.    After reviewing the Draft Bechtel Report, SCANA's outside counsel requested

that Bechtel remove the schedule projections showing that Unit 2 and Unit 3 would not be

completed until much later than SCANA and its senior management, including Marsh and

Byrne, had publicly stated.

191.    SCANA's outside counsel also requested that Bechtel remove much of the

unfavorable language regarding SCANA's management of the project.

192.    Just one week later, on November 19, 2015, SCANA's senior management,

including Marsh and Byrne, testified before the PSC in an *ex parte* hearing to discuss the project

and the EPC Amendment. Their testimony was made publicly available shortly after the

testimony was given.

193.    At the hearing, Marsh testified falsely about SCANA's ability to complete the

project in time to qualify for the production tax credits.

194.    Specifically, Marsh testified: "As you know, those tax credits expire at the end of

2020. We have to have our plants on-line at the end of 2020 to qualify for those. The first plant

is certainly more than a year ahead of that; the second plant is a little bit less than six months

ahead of that . . . ."

195.    Marsh went on to say: "[T]he guaranteed substantial completion dates, those

have moved from June of '19 and June of 2020 for Units 2 and 3 – under the 'EPC' and the 'Fixed Price Option' those have both moved to August of '19 and August of 2020. A couple of months' move there, but still we believe in time to finish the units for the production tax credit qualification."

196.    Byrne also testified falsely at the *ex parte* hearing before the PSC. Byrne testified that under the ECP Amendment the guaranteed substantial completion dates were now August 31, 2019 for Unit 2 and August 31, 2020 for Unit 3, even though he knew that those dates were not achievable.

197.    Byrne also failed to disclose that both units would not be completed until much later and that the schedule was not reliable. Just one month earlier, Byrne himself had authored a document entitled, "No Faith in Schedule Promises." In the document, Byrne listed all of the completion dates promised by Westinghouse over the life of the project, including the current August 2019 and August 2020 dates. In the document, Byrne also referred to an "independent assessment" by Westinghouse that had the completion dates delayed by 13 months beyond the August 2019 and August 2020 dates. Byrne failed to disclose that he had "no faith" in the representations being made by Westinghouse regarding the construction schedule when he testified before the PSC in November 2015.

198.    Bechtel ultimately acquiesced to the demands of SCANA's counsel and agreed to separate its conclusions regarding the schedule and completion dates into a stand-alone report. Bechtel agreed to submit a new report to counsel for SCANA that did not address the unreliability of the schedule.

199.    On or around February 5, 2016, Bechtel delivered the final report to SCANA's counsel ("Bechtel's Final Report").

200.     Bechtel's Final Report was, in essence, a scrubbed version of the Draft Bechtel Report.  Bechtel's Final Report omitted Bechtel's schedule assessment analysis, the predicted actual completion dates for Unit 2 and Unit 3 that extended beyond the production tax credit deadline, and language that the current schedule was unreliable.

201.     Bechtel's Final Report also omitted much of the language regarding SCANA's mismanagement of the project.

202.     SCANA's counsel delivered Bechtel's Final Report to officers of Santee Cooper and SCANA, including Marsh and Byrne.

203.     SCANA and its senior management, including Marsh and Byrne, contradicted Bechtel's adverse findings regarding the schedule and management of the project in their public statements to the ORS, the PSC, and investors.  As Marsh wrote in anticipation of a meeting with Santee Cooper to discuss Bechtel's findings:  "Need to protect document."

204.     Even when faced with direct questions regarding the retention of consultants, SCANA chose to mislead its regulators.  In March 2016, ORS sent SCANA a formal Request for Information asking whether it had retained a project consultant for the V.C. Summer expansion project.  SCANA responded by identifying two consultants who had been paid $5,000 and $25,000, respectively, for services regarding the process of selecting construction payment milestones.  SCANA and its senior management failed to disclose Bechtel as a project consultant, even though Bechtel had been paid $1 million and had rendered a detailed assessment of the construction schedule and SCANA's oversight of the project.

**Defendants Continue to Make False and Misleading Statements as
the Nuclear Expansion Project Falls Further Behind Schedule in 2016**

205.     In 2016, Westinghouse continued to fall further behind schedule in constructing Unit 2 and Unit 3.  SCANA and its senior management knew about these construction delays and

the likelihood that SCANA would not qualify for the $1.4 billion in production tax credits.

206.    Others at SCANA knew as well.  On January 4, 2016, a member of SCANA's nuclear team informed Marsh that she "did not want to be involved in any of the SEC reporting activities because she was scared of [SCANA's] disclosures," according to Marsh's notes from the meeting.

207.    Despite the unreliability of the construction schedule and the likelihood of the company failing to qualify for the production tax credits, SCANA continued to publicize progress being made on the project, including in press releases and videos posted to the internet. These public statements and videos created the false impression that the construction schedule was reliable and that the company would qualify for the production tax credits.

208.    For example, on January 19, 2016, SCANA released a video entitled, "Highlighting a Year of Progress for V.C. Summer Units 2 and 3."  In the video, SCANA touted progress being made in different areas of the project.  SCANA also issued a press release the same day that listed the achievement of several "major milestone[s]."

209.    On January 25, 2016, SCANA's Risk Management Committee held a quarterly meeting, with Marsh and Byrne in attendance.  At the meeting, SCANA executives identified "schedule delays" and the receipt of "production tax credits" as "key risk[s]" and rated them "Red."

210.    SCANA defined "Red" risk areas as:  "Higher area of management concern. Events related to this area have progressed or are progressing in a manner that could be ultimately adverse to the accomplishment of SCANA's strategic plan.  Requires very heightened management attention and activity in this area."

211.    On February 18, 2016, Byrne participated in SCANA's fourth quarter earnings

call and utilized a PowerPoint presentation.  On the call, Byrne referred to a slide that indicated the guaranteed substantial completion dates as being August 2019 for Unit 2 and August 2020 for Unit 3.  Byrne did not disclose that this schedule was unreliable and that, based on the most recent information presented to him, it appeared likely that neither nuclear unit would be completed by those dates.

212.    SCANA posted the transcript from the earnings call and the PowerPoint presentation on its website.  Investors were also allowed to listen to the earnings call.

213.    In addition, despite knowing that the expansion project was severely behind schedule, SCANA filed a Form 10-K with the SEC on February 26, 2016, that repeated the same false and misleading statements regarding the project that had appeared in earlier filings.

214.    SCANA's Form 10-K stated that the nuclear production tax credits "could total as much as approximately $1.4 billion."  SCANA failed to disclose that its nuclear team, including Byrne and Marsh, had concluded that Westinghouse would not complete Unit 2 or Unit 3 in accordance with the revised schedule and, thus, that the schedule was unreliable.

215.    SCANA's Form 10-K further stated, falsely, that "[b]ased on the guaranteed substantial completion dates provided above [August 2019 and August 2020], both New Units are expected to be operational and to qualify for the nuclear production tax credits; however, further delays in the schedule or changes in tax law could impact such conclusions."  At the time, SCANA and its senior management, including Marsh and Byrne, knew that, based on the current rate of progress, the new nuclear units would not be completed in time to qualify for the production tax credits.  SCANA and its senior management, including Marsh and Byrne, also knew that there would be substantial additional delays and, thus, the revised schedule was not reliable.

216.    SCANA's Form 10-K omitted the true status of the nuclear expansion project, including the unreliability of the schedule and the serious doubts about the new units qualifying for the production tax credits.  Instead, SCANA's Form 10-K misleadingly referenced guaranteed substantial completion dates of August 2019 for Unit 2 and August 2020 for Unit 3.

217.    In accordance with Rule 13a-14 of the Exchange Act and Section 304 of the Sarbanes-Oxley Act, Marsh certified that he had reviewed the annual filing and that it contained no untrue statements.  Marsh knew, however, that his certification was false and misleading.

218.    Byrne also knew that the information in SCANA's annual filing was false and misleading.  Nevertheless, on February 26, 2016, Byrne signed a sub-certification letter in connection with the filing that falsely stated he had "no knowledge of any fraud or suspected fraud affecting SCANA or SCE&G[.]"  SCANA required this sub-certification before filing the Form 10-K.

219.    On March 2 and 3, 2016, SCANA executives, including Byrne, made a PowerPoint presentation at investor conferences sponsored by Morgan Stanley and UBS Securities, LLC.

220.    In the presentations, SCANA claimed that it delivered "strong investor value" because the company enjoyed "investment grade credit ratings," a "constructive regulatory environment," and because the company had "transparent" operations.

221.    SCANA also stated that Unit 2 and Unit 3 were scheduled to be completed by August 2019 and August 2020, even though the company and its senior executives knew that those scheduled completion dates were not achievable.

222.    On March 9, 2016, Byrne participated in a similar presentation at an investor conference sponsored by Barclays.

223.    Marsh knew that these investor conferences were taking place and the content of

the PowerPoint presentations that SCANA executives, including Byrne, were making at them.

224.    On March 17, 2016, Byrne attended a meeting with Westinghouse and its new sub-contractor where, among other topics, they discussed the continuing delays in meeting construction milestones.  As another SCANA executive said at the meeting, "we need results."

225.    On March 21, 2016, SCANA's senior management, including Marsh and Byrne, participated in a meeting that included the Board of Directors from SCANA and Santee Cooper. At the meeting, a member of SCANA's Board noted that "for whatever reason progress isn't happening and that needs to change."  Marsh did not disagree with this statement and, according to notes from the meeting, he acknowledged that "the ultimate problem is performance."

226.    On March 28, 2016, SCANA held another Risk Management Committee meeting, which was attended by Marsh and Byrne.  At the meeting, executives again identified "schedule delays" and the receipt of "production tax credits" as "key risk[s]" facing the company.

227.    On March 29, 2016, SCANA filed a Form 14A Proxy Statement with the SEC.

228.    As part of that filing, Marsh signed a letter to the company's shareholders.  In the letter, Marsh wrote:  "During a very challenging 2015, we continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project[.]"

229.    SCANA's Proxy Statement incorporated by reference the company's previous filings with the SEC.  In addition, the Proxy Statement repeated the same misstatements that the company had made in its periodic filings regarding the construction schedule for the new nuclear units and the receipt of federal tax credits.  Specifically, SCANA stated that the tax credits "could total as much as approximately $1.4 billion" and that "[b]ased on the guaranteed substantial completion dates provided above [August 2019 and August 2020], both New Units

are expected to be operational and to qualify for the nuclear production tax credits; however, further delays in the schedule or changes in tax law could impact such conclusions."

230.    On April 15, 2016, SCANA's nuclear team sent the company's senior management, including Marsh and Byrne, a document entitled "SGE&G List."  In the document, SCANA's nuclear team agreed with many of Bechtel's observations and recommendations regarding the lack of progress on the expansion project.

231.    In addition, SCANA's nuclear team made the following comments regarding the problems plaguing the project:

- "Work activities should be planned based on a realistic evaluation of the work, rather than optimistic projections due to schedule pressure from management";

- "Work was performed out of sequence to support fictitious milestone completion of Setting CA20 Module, knowing that a significant effort was required to complete the module";

- "Contractor needs to resource load the schedule based on reasonable unit rates and set performance goals and schedule based on realistic information. Overly aggressive and optimistic schedule dates are not the best way to encourage craft labor performance.  This has been demonstrated by the repeated failure of the contractor to meet published schedule dates for project milestones"; and

- "The Contractor has continually modified metrics and graphs to obscure the poor performance.  Baselines have been repeatedly set and then re-set at a later date, thus making performance measurement impossible.  We should be

46

looking at total project data instead of short-term 9–12 months[.]"

232.    Finally, in the "SCE&G List" document, SCANA's nuclear team noted to Marsh and Byrne: "It would be a good idea to encourage and recognize meaningful progress and successes.  This is difficult to accomplish when the project is not seeing meaningful successes."

233.    On April 28, 2016, despite receiving the "SCE&G List" document less than two weeks earlier, Byrne misleadingly touted significant progress being made on the project during SCANA's first quarter earnings call.  Byrne also presented several photographs of the construction site to show that progress was being made on the project.  In reality, Byrne knew that the project was severely behind the revised schedule and was continuing to fall further behind that schedule every month.

234.    SCANA posted the transcript from the earnings call on its website.  In addition, investors were allowed to listen to the earnings call.

235.    On May 6, 2016, SCANA filed a Form 10-Q with the SEC that repeated the same false and misleading statements as the company's prior filings.  SCANA's Form 10-Q also omitted the true status of the nuclear expansion project, including the unreliability of the schedule and the serious doubts about the new units qualifying for the production tax credits.

236.    In accordance with Rule 13a-14 of the Exchange Act and Section 304 of the Sarbanes-Oxley Act, Marsh certified that he had reviewed the periodic filing and that it contained no untrue statements.  Marsh knew, however, that his certification was false and misleading.

237.    Similarly, Byrne knew that the information in SCANA's periodic filing was false and misleading.  Nevertheless, on May 6, 2016, Byrne signed a sub-certification letter in connection with the filing that falsely stated he had "no knowledge of any fraud or suspected fraud affecting SCANA or SCE&G[.]"  SCANA required this sub-certification before filing the Form

10-Q.

238.     On May 19, 2016, Byrne attended a meeting with Westinghouse regarding the project.  According to the minutes from the meeting, a member of SCANA's nuclear team noted that Westinghouse was not achieving the schedule milestones that it needed to meet for the project to be completed by August 2019 (Unit 2) and August 2020 (Unit 3), and that Westinghouse's mitigation efforts to date had not been successful in remedying these problems. They also discussed difficulties in other areas of the project as well that were affecting the schedule, such as procurement.

239.     The EPC Amendment assumed that Westinghouse could complete Unit 2 by August 2019 and Unit 3 by August 2020 by achieving a percent complete per month rate of 3%. At the May 19 meeting attended by Byrne, however, Westinghouse acknowledged that during the first four months of 2016 it had averaged a monthly percent complete rate of only 0.5%. SCANA's nuclear team knew that, at that rate of progress, it would take an additional seven years to finish the project.

240.     Nevertheless, SCANA published several press releases in 2016 that touted various milestones being met.  By regularly communicating to the public that the project was progressing, SCANA misled investors and others as to the true status of the project and failed to disclose material information revealing that the schedule was unreliable, significant additional delays were likely to occur, and the critical tax credits were at risk.  For example, on April 18, 2016, SCANA issued a press release titled, "SCE&G Achieves Construction Milestone With Placement of Unit 3 Vessel Ring."  In the press release, SCANA wrote that "[p]rogress continues with approximately 3,700 Westinghouse personnel and subcontractor workers on site daily."

**SCANA's May 26, 2016 Petition to the PSC**

241.    On May 26, 2016, SCANA submitted another petition to the PSC to update the construction and capital cost schedules on the nuclear expansion project.  Marsh and Byrne were aware of the petition, which was made publicly available shortly after it was filed.

242.    In its petition, SCANA requested PSC approval to exercise the fixed price option under the EPC Amendment.  As SCANA explained, "under that option, the price of the work necessary to complete the Units is fixed at $3.345 billion."  SCANA had notified Westinghouse a few days earlier that it intended to exercise the fixed price option.

243.    SCANA also requested that the PSC approve the August 2019 (Unit 2) and August 2020 (Unit 3) completion dates in the EPC Amendment.  SCANA reiterated that it could receive federal production tax credits of $2.2 billion "when grossed up for taxes" if Unit 2 and Unit 3 are completed by January 1, 2021.

244.    At the same time, SCANA requested that the PSC find its cost and schedule changes to be the result of reasonable and prudent oversight of the project by the company.

245.    In its May 26, 2016 petition to the PSC, SCANA contradicted the findings of its own nuclear team and Bechtel, including the fact that the construction schedule was unreliable and that the company was unlikely to qualify for the production tax credits.

246.    Additionally, SCANA pressured its partner on the project, Santee Cooper, not to disclose the existence or content of Bechtel's assessment.

247.    On May 26, 2016, SCANA filed a Form 8-K with the SEC and issued a press release announcing the filing of the update petition with the PSC.  SCANA misleadingly stated in them:  "The construction schedule reflected in the Petition indicates a guaranteed substantial completion date for Unit 2 of August 2019 and a guaranteed substantial completion date for Unit

3 of August 2020."  SCANA and its senior executives, including Marsh and Byrne, knew that the schedule was unreliable and that neither new unit would be completed by those dates.

248.    In addition, in the May 26, 2016 press release, Marsh misleadingly stated: "Construction of the two new nuclear units continues to progress."  In fact, Marsh knew that the project was getting further behind schedule every month.

### Defendants Mislead Financial Analysts About the Project

249.    On June 2, 2016, Marsh and Byrne were forwarded an e-mail written by Santee Cooper's Senior Vice President for Nuclear Energy regarding the continued lack of progress on the project.  The Santee Cooper executive wrote:  "Unfortunately, five months after [Westinghouse] has had complete control of the Project, there is little evidence that [it] is taking the steps necessary to resolve these challenges and relieve pressure on the substantial completion dates.  Each meeting I attend we continue to report out and discuss the same basic issues as progress on the critical path continues to slip."

250.    Later that same day, SCANA executives, including Byrne, met with analysts from Wells Fargo Securities, LLC to discuss the expansion project at V.C. Summer.  Marsh had met with the analysts the night before.

251.    At the June 2, 2016 meeting, Byrne presented a PowerPoint presentation that misleadingly stated that the "new in service dates" for Unit 2 was "August 2019" and for Unit 3 was "August 2020."  Byrne knew that Unit 2 and Unit 3 were nowhere close to being "in service" by those August dates – i.e., they would not be producing power in time to qualify for the federal production tax credits.  Byrne nevertheless presented, as he had many times before, photographs of the construction site that purported to show meaningful progress being made on the project all the while knowing that the project was significantly behind schedule.

252.    The next day, Byrne again touted the August 2019 and August 2020 "in service dates" in a video presentation to Fitch Ratings, Inc., the entity that was rating SCANA's debt.

253.    Neither Byrne nor any other SCANA representative told Fitch about Bechtel's findings that Unit 2 and Unit 3 would not be completed on schedule.  In addition, SCANA and its executives, including Byrne, did not disclose the continuing deterioration of the project schedule, including the monthly data that showed construction was not progressing at the rate necessary to complete Unit 2 by August 2019 and Unit 3 by August 2020.

**SCANA Issues Another $500 Million in First Mortgage Bonds**

254.    On August 27, 2015, SCANA filed with the SEC another Automatic Shelf Registration statement on Form S-3ASR to register the sale of first mortgage bonds.  The Form S-3ASR registration statement incorporated by reference certain prior filings and all subsequently filed periodic reports filed by SCANA, including the periodic reports discussed in this Complaint. Marsh signed the Form S-3ASR.

255.    On June 8, 2016, SCANA issued $500 million in First Mortgage Bonds.  SCANA issued $425 million in bonds with an interest rate of 4.10% and a maturity date of June 15, 2046, and $75 million in bonds with an interest rate of 4.50% and a maturity date of June 1, 2064.

256.    Byrne's misleading presentation to Fitch the week before had the desired effect. Fitch reaffirmed SCANA's "Stable" rating on June 9, 2016, which was the day after SCANA issued the First Mortgage Bonds.  Fitch also gave SCANA's new bond offering an "A-" rating.

257.    SCANA was able to sell all $500 million in First Mortgage Bonds at, as one executive described it, "amazing interest rates."  SCANA used proceeds from the bond sales on the nuclear expansion project at V.C. Summer.

258.    Marsh and Byrne knew about the $500 million bond offering and the

representations in its related registration statement filed with the SEC. Indeed, Marsh congratulated the finance team for selling the bonds.

259. At this time, SCANA had a market capitalization of around $10 billion.

**Defendants Mislead the PSC (Again)**

260. In June 2016, SCANA and Santee Cooper were still trying to evaluate recommendations made by Bechtel and how those recommendations should be implemented. On June 17, 2016, Marsh received a "Project Assessment Report" and an "Executive Summary" from SCANA's nuclear team that addressed some of the issues raised by Bechtel.

261. SCANA's nuclear team recognized that Bechtel had raised "valid concerns" with the construction schedule. The team also listed the development of "a project schedule plan to achieve construction completion of at least 3% per month" as a "key issue."

262. A little over a week later, on June 27, 2016, Marsh and Byrne attended a Risk Management Committee meeting. At the meeting, SCANA executives again identified "schedule delays" and the receipt of "production tax credits" as "key risk[s]" facing the company and rated them "Red," meaning that there was significant risk that the company would not qualify for the tax credits.

263. The very next day, on June 28, 2016, SCANA filed a revised rate petition with the PSC in which it sought to receive increased rates from its customers. Marsh and Byrne were aware of the petition, and the petition was made publicly available shortly after it was filed.

264. On June 29, 2016, Byrne received a copy of a PowerPoint presentation that Westinghouse and its sub-contractor planned to present the next day to senior executives at SCANA and Santee Cooper.

265. The presentation provided a grim status of the expansion project in "5 Project Focus

Areas." These five focus areas included: (i) Procurement; (ii) Modules – Structural and

Mechanical; (iii) Prevention of and Timely Resolution of Design Issues; (iv) Construction

Resources; and (v) Construction Efficiency/Schedule Adherence. The presentation made clear that

the extensive problems in all of the focus areas affected the reliability of the construction schedule

and raised doubts about Westinghouse's ability to complete Unit 2 and Unit 3 in time for SCANA

to qualify for the $1.4 billion in production tax credits.

266. Although Westinghouse was going to present the information, SCANA's own

nuclear team drafted slides regarding the five project focus areas for the presentation.

267. For Procurement, SCANA's nuclear team wrote: "The project does not have

equipment and commodities that meet requirements readily available to support construction work

fronts. This impacts the ability of the project to reliably achieve schedule."

268. For Modules – Structural and Mechanical, SCANA's nuclear team wrote:

"Modules are not being fabricated and delivered in accordance with the project execution plan.

Modules are delivered later than the construction need date. A significant number of modules are

delivered incomplete or with quality issues. This requires outfitting, rework or repair at the project

site that is not part of the baseline schedule."

269. For Prevention of and Timely Resolution of Design Issues, SCANA's nuclear team

wrote: "The project does not adequately address constructability issues requiring design changes

or interpretations. All engineering design is not finalized in time to procure adequate material and

plan work in advance of construction. **This adversely impacts the ability to reliably achieve**

**schedule."** [Emphasis added].

270. For Construction Resources, SCANA's nuclear team wrote: "The project does not

have sufficient resources to support active construction work fronts. This impacts the ability of the

project to reliably achieve schedule or mitigate issues from engineering, procurement, or constructability delays."

271.    Finally, for Construction Efficiency/Schedule Adherence, SCANA's nuclear team wrote: **"The project performance factor (PF) is consistently above the goal (PF>2 each month in 2016) and trending in a negative direction. The majority of project milestones are not met on their scheduled dates. The percentage of schedule activities completed on time is well below the goal and does not allow for a reliable Integrated Project Schedule."** [Emphasis added].

272.    On June 30, 2016, Westinghouse and its sub-contractor made the presentation at a meeting that included Santee Cooper's and SCANA's senior management, including Marsh and Byrne.

273.    The very next day, July 1, 2016, Marsh and Byrne submitted written testimony to the PSC in support of SCANA's petition that the PSC adopt August 2019 and August 2020 as the Guaranteed Substantial Completion Dates for Unit 2 and Unit 3 and approve the fixed price option. Their testimony was made available to the investing public.

274.    Marsh began by stating: "All company witnesses testify in support of the reasonableness and prudency of the updated construction schedule and the related schedule of capital costs it represents. From my knowledge of the project and my perspective as SCE&G's Chief Executive Officer, I can affirmatively testify, as I have testified in prior proceedings, that SCE&G is performing its role as project owner in a reasonable, prudent, and cost-effective manner." In fact, contrary to this statement, Marsh knew that Bechtel had raised serious doubts about the manner in which SCANA was overseeing the nuclear expansion project.

275.    Marsh also misleadingly stated: "The federal tax credits that are available to the

54

project are worth a total of $2.2 billion to customers.  Both of our plants must produce power before the end of 2020 to qualify for the full amount of these credits.  The [guaranteed substantial completion date] for Unit 2 is now 16 months ahead of that deadline and th[e] [guaranteed substantial completion date] for Unit 3 is four months ahead of it."  Marsh knew that the construction schedule was unreliable and unachievable, and that neither nuclear unit was likely to be completed in time to qualify for the production tax credits.

276.    Marsh concluded:  "In light of these facts, we believe that the logical and prudent choice is to proceed with the construction plan and apply the BLRA as written."

277.    In his written testimony, Byrne falsely stated that the August 2019 and August 2020 substantial completion dates and the construction schedule that supported them were reasonable.

278.    Specifically, Byrne testified, falsely, that:  "The substantial completion dates and the construction schedules . . . are based on extensive construction data that Westinghouse has provided to [SCANA] . . . .  [SCANA's] construction experts have reviewed this schedule and found that its scope and sequencing is logical and appropriate. . . .  Consistent with its responsibilities as Owner, [SCANA] has carefully reviewed and evaluated all information that is available related to the project and schedule and finds it to be reasonable.  **In my opinion, Westinghouse . . . [has] a reasonable construction plan in place to achieve the Guaranteed Substantial Completion Dates" (i.e., August 2019 and August 2020).**  [Emphasis added].

279.    Byrne concluded by falsely stating:  "It is my considered opinion that [the revised schedule] represents a reasonable and prudent schedule for completing the project . . . and should be adopted as an update to the construction schedule that was initially adopted[.]"  As additional support for the petition, Byrne attached photographs of the project to his pre-filed testimony to show progress being made on completing the new nuclear units.

280.    In terms of the production tax credits, Byrne testified that SCANA "and its customers stood to lose approximately $2.2 billion in projected benefits if neither Unit were to meet the deadline."  Byrne then falsely claimed that SCANA was "able to address this problem" through the EPC Amendment.

281.    At the same time, another SCANA executive falsely testified before the PSC that: "In each update case since 2009, the Company has come before the [PSC] with the best information available concerning the anticipated construction schedule for completing the Units and the anticipated costs associated with that schedule."  That executive went on to say:  "The current schedules reflect the best information available about the anticipated costs and construction timetables for completing the project."

**Defendants Mislead the ORS Regarding the Project**

282.    On or about June 30, 2016, the ORS's Executive Director sent a letter to Marsh detailing the ORS's concerns regarding the validity of the schedules for Unit 2 and Unit 3.  The letter, which the ORS drafted to be sent to the Public Utilities Review Committee ("PURC") and the governor of South Carolina, explained:  "The ORS is currently in a heightened state of concern regarding the construction cost overruns and schedule delays for V.C. Summer (VCS) Nuclear Units 2 & 3. . . .  In the case of Unit 2, ORS believes that, while the date in the filing of August 31, 2019 is unlikely to be met, it is possible that Unit 2 may still be able to qualify for the Federal Production Tax Credits that expire on December 31, 2020.  However, completing Unit 2 in time to receive the Federal Production Tax Credits will require improvements to the current construction methodology."

283.    The ORS's letter continued:  "ORS has no confidence that Unit 3 can meet the Current Federal Production Tax Credit Deadline of December 31, 2020. . . .  This makes the

validity of the current schedule highly suspect."

284.    The ORS's Executive Director requested that SCANA "respond to the issues raised in the letter before they complete the final version."  Marsh forwarded ORS's letter to Byrne and other SCANA executives on July 1, 2016.  Marsh tasked Byrne and another SCANA executive with drafting a response on behalf of SCANA that could be incorporated into ORS's letter.

285.    The ORS also informed SCANA that it wanted to depose a Westinghouse representative regarding the project and, in particular, the EPC Amendment and the project schedule.

286.    On June 29, 2016, Marsh and another SCANA executive met with the ORS's Executive Director to discuss the deposition of a Westinghouse representative.

287.    Marsh drafted his own "notes for discussion" to use in an upcoming conversation with the ORS's Executive Director that made clear his desire for the ORS not to express its doubts about the project publicly or to depose a representative from Westinghouse.  Marsh's notes also describe the impact such public statements by the ORS would have on SCANA's ability to sell securities at favorable rates.

288.    Specifically, Marsh wrote:  "If you [ORS] go forward, it will be hard to put this genie back in the bottle.  Potential for devastating results."

289.    Marsh continued:  "The financial markets see the ORS, and you specifically, as the face of regulation in SC.

- Credit rating agencies
- Bond underwriters
- Investment analysts
- Shareholders

- Banks

Your planned actions will send shock waves to this group.  You will be overrun with

calls and inquiries.  They will jump to conclusions and publish their thoughts and

concerns."

290.    Marsh then noted:  "Our public disclosures to the SEC and investors will have to

address this and address as a risk.  The 'supportive regulatory environment' in SC is the

foundation of our bond ratings and the support we receive from the financial community.

Without that support, **we will have difficulty selling our securities at favorable prices**, which

will raise prices for our customers."  [Emphasis added].

291.    In an attempt to reassure ORS and assuage its concerns regarding the schedule,

Marsh's notes also directed ORS to recently filed PSC testimony by Byrne stating that the

schedule was reasonable and achievable – testimony that Marsh knew was false.

292.    SCANA's senior management, including Marsh and Byrne, engaged in a

concerted effort to persuade ORS not to state publicly that it thought SCANA might not qualify

for the production tax credits.

293.    Among other changes, SCANA tried to eliminate the statements in ORS's letter

about the reliability of the schedule and the likelihood of the company receiving production tax

credits.  ORS had originally written:  "ORS has no confidence that Unit 3 can meet the current

Federal Production Tax Credit Deadline of December 31, 2020. . . .  This makes the validity of

the current schedule highly suspect."  SCANA sought to change the language to:  "In sum, ORS

believes that completing Unit 2 by the August 31, 2019 date in [SCANA's] most recent filing

and completing Unit 3 in time to receive the Federal Production Tax Credits that expire on

December 31, 2020, will require improvements to the current construction methodology."

294.    In addition, SCANA mentioned the "five project focus areas" in its response to

the ORS's draft letter, but failed to describe all of the problems in those areas that made the current schedule unreliable. Just a few days earlier, SCANA's nuclear team had written: "The percentage of schedule activities completed on time is well below the goal and does not allow for a reliable Integrated Project Schedule." Yet, SCANA failed to include this or similar language in its response to the ORS.

295.    SCANA's attempt to soften the language in ORS's letter succeeded. The letter that ORS submitted to the PURC did not say that "ORS has no confidence that Unit 3 can meet the Current Federal Production Tax Credit Deadline of December 31, 2020."

**Defendants Mislead the Nuclear Advisory Council**

296.    On July 13, 2016, Marsh received an e-mail from a member of the company's nuclear team regarding construction milestones for June 2016. Marsh was told that Westinghouse "completed 4 of the 27 projected milestones (14.8% complete 85.2% not complete)." Another SCANA nuclear team member noted that this was a "dismal performance."

297.    The same day, Santee Cooper's CEO sent Marsh an e-mail regarding the lack of progress on the project. Santee Cooper's CEO wrote: "What has particularly frustrated Santee Cooper from the date of the 2015 [EPC] Amendment is [Westinghouse's] failure to seize an opportunity and significantly ramp up construction progress at the site. The primary purpose of the fixed price option and milestone payment schedule is to incentivize [Westinghouse] to get the units built. Through the last 6 months, while [SCANA and Santee Cooper] have paid $600 million dollars, construction progress has only been an aggregate of 3%. Moreover, for the June billing period, had [SCANA and Santee Cooper] accepted [Westinghouse's] milestones and payment schedule, which contained twenty-seven milestones and requested payment of $156 million for the month, only four of the twenty-seven were completed, which would entitle

[Westinghouse] to payment of just $23.1 million. **This rate of progress will never meet the current completion schedule, impacting production tax credits, the availability of cheaper energy for our customers, and bringing the costs of construction to conclusion**." [Emphasis added].

298.    Marsh forwarded the e-mail from Santee Cooper's CEO to Byrne on July 14, 2016.

299.    That same day, Byrne appeared at one of the Nuclear Advisory Council's meetings. The Nuclear Advisory Council was a group that advised the Governor of South Carolina on issues pertaining to nuclear activities in the state. Byrne misleadingly testified at the meeting that Unit 2 and Unit 3 would be "online" and "making power" by August 2019 (Unit 2) and August 2020 (Unit 3), even though Byrne knew that the construction schedule was unreliable and the project was significantly behind that schedule.

300.    At the July 14, 2016 meeting, Byrne and a council member also engaged in the following discussion:

Council:  What is your best estimate when you think you are going to be done?

Byrne:    We think the current schedule is achievable. Their guaranteed substantial completion date for us contractually is August 2019 for the first unit and 12 months later for the second.

Council:  Completed, does that mean online?

Byrne:     Yes that means on line, making power.

301.    Byrne knew that his statements to the Nuclear Advisory Council were false.

**Defendants Make False and Misleading Statements on SCANA's**
**Second Quarter Earnings Call and in SCANA's Quarterly Report**

302.    On July 21, 2016, Byrne attended a meeting with other members of SCANA's nuclear team and Westinghouse. At the meeting, Westinghouse reported that the monthly percent

complete percentages for March through June 2016 were still far below the 3% needed to complete Unit 2 by August 2019 and Unit 3 by August 2020.

303.    At this time, Byrne knew that eight months after entering into the EPC Amendment the pace of construction was still lagging far behind where it needed to be for SCANA to complete the new units on schedule.  More specifically, Byrne knew that for the first six months of 2016 the monthly percent complete percentages were as follows:

| MONTH | EXPECTED PERCENT COMPLETE | ACTUAL PERCENT COMPLETE |
|---|---|---|
| January 2016 | 3% | 0.3% |
| February 2016 | 3% | 0.5% |
| March 2016 | 3% | 0.6% |
| April 2016 | 3% | 0.6% |
| May 2016 | 3% | 0.7% |
| June 2016 | 3% | 0.8% |
| **TOTAL** | 18% | 3.5% |

304.    One week later, on July 26, 2016, Marsh and Byrne attended SCANA's quarterly Board of Directors meeting.

305.    At the meeting, Byrne presented a "New Nuclear Construction Update" that highlighted the unreliability of the construction schedule and raised serious doubts about SCANA's ability to complete the expansion project in time to receive the production tax credits.

306.    Byrne's presentation addressed "Five Project Focus Areas," and stated:

- "The project does not have equipment and commodities that meet requirements readily available to support construction work fronts.  This impacts the ability of the project to reliably achieve schedule."

- "Modules are not being fabricated and delivered in accordance with the project execution plan. Modules are delivered later than the construction need date. A significant number of modules are delivered incomplete or with quality issues. This requires outfitting, rework or repair at the project site that is not part of the baseline schedule."

- "The project does not adequately address constructability issues requiring design changes or interpretations. All engineering design is not finalized in time to procure adequate material and plan work in advance of construction. This adversely impacts the ability to reliably achieve schedule."

- "The project does not have sufficient resources to support active construction work fronts. This impacts the ability of the project to reliably achieve schedule or mitigate issues from engineering, procurement or constructability delays."

- "The project performance factor (PF) is consistently above the goal and trending in a negative direction. The majority of project milestones are not met on their scheduled dates. The percentage of schedule activities completed on time is well below the goal and does not allow for a reliable Integrated Project Schedule."

307.    On the same day that Byrne was presenting this dire assessment of the project schedule to SCANA's Board of Directors, other members of SCANA's nuclear team made a presentation to the ORS regarding the status of the project that did not include any such language. Instead, SCANA's presentation to the ORS identified the same "Big Five Focus Areas" (procurement, schedule, construction, engineering, and modules), but instead of noting the severe problems in each area the SCANA nuclear team touted the progress being made in all of them.

308.    Just two days later, on July 28, 2016, Byrne made false and misleading statements in SCANA's second quarter earnings call with analysts.

309.    An analyst from UBS Securities, LLC asked Byrne: "So I wanted to follow up a little bit on the timetable and schedule on the project and specifically on the milestones, if you could provide a little bit more of an update there, and ultimately, if and/or when you expect to do – or hear back from Flour [Westinghouse's sub-contractor] as to more of an integrated schedule update for the overall project."

310.    Byrne responded with the following misstatement: **"The guaranteed substantial completion dates remain at August of 2019 for unit 2 and August of 2020 for unit 3.  We don't see anything to change those**.  Fluor's review of the schedule is really something that should conclude somewhere in the third quarter and they will be giving that to Westinghouse. . . .  I don't expect anything to necessarily change from that review, save for perhaps the number of hours it might take and shifts that they would have to put on, that kind of thing.  So the goal of that schedule review was to hold the dates constant and see what it would take to accomplish those dates.  So I don't expect anything dramatic to come from that."  [Emphasis added].

311.    SCANA posted the transcript from the earnings call on its website.  In addition, investors were allowed to listen to the call.

312.    Following Byrne's affirmation of the guaranteed substantial completion dates during the July 28, 2016 earnings call, analysts issued reports emphasizing SCANA and its senior executives' confidence that Unit 2 and Unit 3 would be completed by August 2019 and August 2020.  Analysts stated:

- "management remained resilient today on its project schedule";

- "importantly . . . the guaranteed substantial completion dates are not being debated";

-  "[m]anagement expressed confidence that the guaranteed substantial completion dates of Aug. 2019 (Unit 2) and Aug. 2020 (Unit 3) are achievable"; and

- "[c]onstruction seems to be progressing on schedule to meet the completion dates August 2019/2020 for Units 2 and 3" and "SCG doesn't expect major changes to the schedule."

313.    On July 29, 2016, Marsh told the company's board of directors in an e-mail that Byrne and another executive "did a great job answering questions" on the earnings call.

314.    On August 5, 2016, SCANA's nuclear team, including Byrne, made another misleading presentation to the ORS. In particular, SCANA's nuclear team failed to disclose the significant problems in the five project areas that made the construction schedule unreliable and Unit 2 and Unit 3 unlikely to be completed in time for SCANA to qualify for the tax credits.

315.    Later in August 2016, just a few weeks after the earnings call, SCANA and Santee Cooper argued before a Dispute Resolution Board that they should not have to pay Westinghouse millions of dollars each month for work that Westinghouse was supposed to complete under the construction schedule but had not done so. The Dispute Resolution Board had been established to resolve disputes between SCANA/Santee Cooper and Westinghouse.

316.    At the hearing, Byrne made a presentation regarding the lack of progress by Westinghouse on completing Unit 2 and Unit 3. Byrne stated, among other things, that: "The transition to Fluor [a new sub-contractor] did not yield the improvements to PF [performance factor] and ratios that [Westinghouse] had expected and the EAC contemplated"; SCANA and Santee Cooper are "concerned that [Westinghouse] cannot complete the Project within the Fixed

Price Option"; and Westinghouse "has had schedule slippage and may be unable to complete Units 2 and 3 by the current GSCDs [guaranteed substantial completion dates], which could put tax credits at risk."

317.    In other words, when Byrne spoke to financial analysts regarding the project, he confidently touted the construction schedule and stated that the new nuclear units would be completed in time to receive the production tax credits.  Around the same time, when Byrne spoke to the Dispute Resolution Board about paying Westinghouse under the EPC Amendment, Byrne expressed concern that Unit 2 and Unit 3 would not be completed in time for SCANA to receive the production tax credits and noted that Westinghouse was not meeting the milestones in the construction schedule that would allow the new units to be completed in time to do so.

318.    On August 5, 2016, SCANA filed a Form 10-Q with the SEC that repeated the same false and misleading statements that the company made in its earlier filings.  SCANA's Form 10-Q also omitted the true status of the nuclear expansion project, including the unreliability of the schedule and the serious doubts about the new units qualifying for the production tax credits.

319.    In accordance with Rule 13a-14 of the Exchange Act and Section 304 of the Sarbanes-Oxley Act, Marsh certified that he had reviewed the periodic filing and that it contained no untrue statements.  Marsh knew, however, that his certification was false and misleading.

320.    Similarly, Byrne knew that the information in SCANA's periodic filing was false and misleading.  Nevertheless, on August 5, 2016, Byrne signed a sub-certification letter in connection with the filing that stated he had "no knowledge of any fraud or suspected fraud affecting SCANA or SCE&G[.]"  SCANA required this sub-certification before filing the Form 10-Q.

321.    SCANA also repeated the same false and misleading statements in its BLRA

Quarterly Report regarding the construction schedule, its oversight of the project, and its disclosures to the PSC and ORS.  SCANA filed the report on August 12, 2016.

322.    On August 31, 2016, SCANA published a press release titled, "SCE&G Achieves History-Making Milestone With Placement of V.C. Summer Unit 2 Reactor Vessel."  In the press release, Marsh is quoted as saying:  "Successful placement of the Unit 2 reactor vessel is a very significant milestone on our path to completing the construction of the two nuclear units."  SCANA failed to disclose the true status of the project in its press release.

**Defendants Make False and Misleading Statements at SCANA'S "Media Day" and on SCANA's Third Quarter Earnings Call**

323.    In 2016, SCANA established a Construction Oversight Review Board ("CORB") to assuage Santee Cooper's concerns that SCANA's management and oversight capabilities were limited by its lack of expertise.  SCANA agreed to establish the CORB, which was supposed to provide an independent assessment of the project's progress, in return for Santee Cooper remaining quiet about Bechtel's findings.  As one SCANA executive described it:  **"We agreed to the CORB in return for flushing the Bechtel report."**

324.    In September 2016, Marsh and Byrne each received copies of a draft report prepared by the CORB.  The draft report had a negative assessment of the project's status and found that, as a result of continued delays, "[t]he Unit 2 and Unit 3 project schedules include significant risks to achieve substantial completion."  In fact, according to the report, "[t]he current schedule for Unit 2 has slipped 5 months in a 6-month period[.]"

325.    Two weeks after receiving the draft CORB report, Marsh and Byrne appeared at a SCANA "Media Day" event to tout the progress being made on the project.

326.    Representatives from several news organizations attended the event, including the Associated Press, Charlotte Business Journal, and The State.  Each attendee received media kits

that included the following written misrepresentation:  "The vast majority of the major components and equipment have now been received on site, and the units are projected to be complete in August 2019 and August 2020 respectively."  Marsh and Byrne both received a copy of the media kit, including this misrepresentation, the day before the event was held.

327.    During the "Media Day" event, which was held on September 21, 2016, Marsh misleadingly stated:  "This is a large project.  It's a massive project, whatever term you want to put on it.  It's a long term project, and in projects of this nature you're going to have some challenges and issues.  We've had challenges and issues. . . .  We've been able to meet those challenges, make adjustments to the contract, and continue progress on the project."

328.    Marsh also misleadingly stated that the company would qualify for more than $1 billion in production tax credits.  Marsh concluded his remarks by stating:  "We're excited about where we are.  We've had challenges.  We've been able to work through those challenges."

329.    Byrne also made false statements during the "Media Day" event.  Specifically, Byrne falsely stated:  "The pace of this project is quickening.  We have run into some issues and roadblocks in the past, most of those issues and roadblocks are behind us."  Byrne then displayed several photographs of the construction site to show progress being made on the project.  In fact, the project was severely behind schedule and falling further behind schedule every month.

330.    On September 22, 2016, Marsh submitted additional written testimony to the PSC in which he falsely stated:  "In [our update petition] filing, SCE&G proposed specific adjustments to the construction schedule and capital cost schedules for the V.C. Summer Units 2 & 3 . . . Through our pre-filed direct testimony, we presented evidence that the proposed adjustments were reasonable, were amply justified by the evidence and were in no way the result of imprudence on the Company's part, which is the legal standard in these matters."  This testimony was made

publicly available shortly after it was filed.

331.    Four days later, on September 26, 2016, Marsh and Byrne attended a meeting with Westinghouse that included a discussion of the five focus areas (procurement, schedule, construction, engineering, and modules) and the problems in all of those areas that were affecting the reliability of the schedule and the ability to complete the new units on time.

332.    On October 20, 2016, SCANA's nuclear team, including Byrne, and Santee Cooper personnel attended another meeting with Westinghouse regarding the lack of progress on the expansion project.  At the meeting, a member of SCANA's nuclear team noted that "there are so many loose ends" that he doesn't have "a high level of comfort that we will be successful." Another member of SCANA's nuclear team noted that construction progress was still lagging behind where it needed to be in order to complete the project on schedule.  In short, SCANA's nuclear team emphasized to Westinghouse that they need "more energy and commitment to meeting schedule dates" and that they need to "look at how they are managing schedule adherence."

333.    At the same meeting, an executive from Santee Cooper questioned whether achieving the required monthly progress necessary to complete Unit 2 and Unit 3 under the schedule was "a pipe dream" and if they will "ever get there."

334.    A week later, on October 27, 2016, Byrne participated in SCANA's third quarter earnings call.  In a PowerPoint presentation for the call, Byrne misleadingly noted that the "new in service date[]" for Unit 2 was August 31, 2019, and for Unit 3 was August 31, 2020.  At the time he made these statements, Byrne knew that neither unit would be completed by those dates.  Byrne also indicated that a recent agreement with the ORS "supports the approval of the revised construction and capital cost schedules."  Byrne failed to disclose that SCANA had withheld

information from the ORS, including that SCANA's own nuclear team had determined that the schedule was unreliable and that SCANA's senior management had informed the company's Board of Directors of that determination.

335.    On the call, Byrne further stated that SCANA was "very happy with what Fluor [Westinghouse's new sub-contractor] is doing for us" and that "they've been very successful recently."

336.    SCANA posted the transcript from the earnings call and the PowerPoint presentation on its website.  In addition, investors were allowed to listen to the earnings call.

337.    On November 4, 2016, SCANA filed a Form 10-Q with the SEC that repeated the same false and misleading statements that the company made in its earlier filings.

338.    SCANA's Form 10-Q also omitted the true status of the nuclear expansion project, including the unreliability of the schedule and the serious doubts about the new units qualifying for the production tax credits.

339.    In accordance with Rule 13a-14 of the Exchange Act and Section 304 of the Sarbanes-Oxley Act, Marsh certified that he had reviewed the periodic filing and that it contained no untrue statements.  Marsh knew, however, that his certification was false and misleading.

340.    In addition, Byrne knew that the information in SCANA's periodic filing was false and misleading.  Nevertheless, on November 4, 2016, Byrne signed a sub-certification letter in connection with the filing that falsely stated he had "no knowledge of any fraud or suspected fraud affecting SCANA or SCE&G[.]"  SCANA required this sub-certification before filing the Form 10-Q.

**Defendants Make False and Misleading Statements
on SCANA's Fourth Quarter Earnings Call**

341.    On November 7 and 8, 2016, Marsh and other executives from SCANA attended

the EEI Financial Conference in Scottsdale, Arizona.  The EEI Financial Conference involved, among other things, meetings between SCANA executives and financial analysts.

342.    At the EEI Financial Conference, SCANA executives utilized an "Investor Presentation" that addressed various topics, including the expansion project at V.C. Summer. SCANA's Investor Presentation contained several false and misleading statements about the project.  Specifically, the presentation touted the "August 2019" and "August 2020" completion dates for Unit 2 and Unit 3, even though SCANA and its senior executives knew that the schedule was unreliable.

343.    On November 16, 2016, SCANA's nuclear team met with representatives from Westinghouse to discuss the expansion project.  Notes from the meeting reflect that a member of SCANA's nuclear team observed that at the current rate of progress it would take an additional **seven years** to complete Unit 2 – *i.e.*, well beyond what SCANA and its senior executives, including Marsh and Byrne, had publicly acknowledged and far past the deadline for receiving the production tax credits.

344.    On November 22, 2016, SCANA's senior executives, including Marsh and Byrne, attended a meeting to discuss the possible release of Bechtel's Final Report.  According to an e-mail sent after the meeting, Marsh and Byrne were "adamantly opposed to th[e] release" of the report.

345.    That same day, Marsh and Byrne, along with representatives from Santee Cooper, attended a "CORB Debrief" meeting regarding the project.  The CORB reached many of the same conclusions regarding the expansion project as Bechtel had reached a year earlier.

346.    According to Byrne's notes from the meeting, Santee Cooper's CEO asked a CORB member:  "Is there a fully integrated proj schedule that takes proj to completion?"  The

CORB Chairman answered, "No."  Another executive from Santee Cooper then asked whether they have the "right people" in Westinghouse and the new sub-contractor (Fluor).  The CORB Chairman answered, "Probably Not."  Finally, another CORB member succinctly stated:  "Still don't have realistic sked," meaning that even after several years of construction and the expenditure of several billion dollars, there still was not a realistic project schedule to complete the new nuclear units.

347.    A draft written report followed the CORB "debrief."  The draft report, which Marsh received a copy of, was critical of SCANA's oversight of the expansion project.  The draft report noted that SCANA's "oversight is insufficient for some project activities, including:  the Project Execution Strategy, prioritization of project tasks, schedule performance, contract administration, and performance monitoring."

348.    On November 28, 2016, Santee Cooper's CEO sent an e-mail to Marsh regarding the overall management of the nuclear expansion project.  Byrne received a copy of the e-mail as well.  In the e-mail, Santee Cooper's CEO expressed "frustration" at the lack of "project management expertise in large scale EPC construction."  Santee Cooper's CEO stated, similar to what Bechtel had found, that SCANA did not have the expertise necessary to oversee a mega-project like the V.C. Summer expansion.

349.    In addition, Santee Cooper's CEO indicated in his e-mail that he wanted to release publicly Bechtel's Final Report.

350.    A week after the CORB debriefed SCANA's senior management, the PSC approved SCANA's petition to adopt the fixed price option and make August 2019 and August 2020 the substantial completion dates for Unit 2 and Unit 3.  The PSC specifically referred to Byrne's testimony in concluding that the revised completion dates were "reasonable forecasts of

the time required for completing the Units and supported by the evidence of record in this proceeding."

351.    Between the time SCANA filed the petition on May 26, 2016, and the PSC's ruling on November 28, 2016, however, SCANA and its senior executives failed to correct their false and misleading statements regarding the reliability of the construction schedule and the likelihood of receiving the federal tax credits.  To the contrary, they repeatedly touted the unrealistic completion dates and the production tax credits that SCANA was not going to receive at the current rate of progress on the project.

352.    On December 15, 2016, Byrne attended another meeting with Santee Cooper and Westinghouse to discuss the expansion project.  At the meeting, a Santee Cooper executive expressed concern about the lack of progress each month and stated:  "**if you do the math it's hard to see that we are going to get there.**"  [Emphasis added].

353.    Byrne's own handwritten notes from the meeting expressed the same sentiment: "Doesn't seem to be plan to improve % complete – Need 2x-3x."  In other words, Westinghouse would need to double or triple the rate of progress on the project to meet the deadlines in the schedule, which is something Westinghouse had been unable to do during the multi-year project.

354.    SCANA nevertheless continued issuing press releases that touted progress being made on the project.  For example, on December 19, 2016, SCANA published a press release entitled, "SCE&G Sets 2.4 Million Pound Module for V.C. Summer Unit 3."  In the press release, SCANA stated:  "To see this nuclear construction milestone and more, visit SCE&G on Flickr and YouTube."

355.    On December 27, 2016, Westinghouse's parent company, Toshiba Corporation, publicly announced that the cost to complete the nuclear expansion project would far surpass the

original estimates.

356.    That same day, Marsh participated in a call with Westinghouse regarding the project. Marsh wrote in his notes from the call: "**Schedules unrealistic.**" [Emphasis added].

357.    On December 29, 2016, Byrne and Santee Cooper's Senior Vice President for Nuclear Energy met with a representative from Westinghouse's sub-contractor (Fluor) at a coffee shop. According to the Santee Cooper executive's notes from the meeting, Westinghouse's sub-contractor stated that Westinghouse was still using mandatory constraints to hold the schedule to artificial completion dates. In other words, Westinghouse would not allow its sub-contractor to create a re-baselined schedule to determine when the new units would actually be completed. This is essentially what Bechtel had noted more than a year earlier. Marsh received a copy of the Santee Cooper executive's notes from the meeting a few days later.

358.    On January 4, 2017, Marsh and Byrne received an e-mail from Santee Cooper's CEO that included a list of "proposed issues" to raise at a planned meeting with Westinghouse on January 6, 2017. In terms of the construction schedule, Santee Cooper's CEO wrote: "**Current production factors, which are in decline, render meeting the stated project schedule an impossibility.**" [Emphasis added].

359.    On January 6, 2017, SCANA's senior management, including Marsh and Byrne, attended the meeting with Santee Cooper and Westinghouse to discuss the deteriorating status of the expansion project. According to Byrne's notes, Marsh asked, "How did we get here?" Marsh went on to recognize that the schedule has "a lot more risk in it" than previously acknowledged publicly and that Westinghouse's sub-contractor estimates additional delays. Santee Cooper's CEO observed that it would be a "disaster" to send their regulator a schedule that "is unbelievable." Marsh's own notes reflect that Westinghouse "did not confirm 2020," meaning that

Westinghouse did not commit to completing the new nuclear units in time for SCANA to qualify for the production tax credits.

360.    Five days later, on January 11, 2017, SCANA published another misleading press release entitled, "SCE&G Places First AP1000 Steam Generator in the U.S."  In the press release, SCANA touted progress being made on the expansion project and directed investors to the website, www.scana/com/investors/nuclear-development, to "see this nuclear construction milestone and more[.]"

361.    On February 14, 2017, SCANA issued a press release stating that Westinghouse and its parent company, Toshiba, "are committed to completing the two new" nuclear units "being constructed in Jenkinsville, SC."  SCANA also misleadingly stated that Westinghouse provided it with "revised in-service dates of April 2020 and December 2020 for Units 2 and 3, respectively," and that the revised schedule "would enable both units to qualify . . . for the federal production tax credits."  SCANA and its senior executives knew that this revised schedule was not realistic.  The same day, SCANA filed a Form 8-K with the SEC providing the same misleading information.

362.    Two days later, on February 16, 2017, Byrne and Marsh participated in SCANA's fourth quarter earnings call.  According to SCANA's Chief Financial Officer, it was important for SCANA's CEO (Marsh) to be on the call because of the "severity of the situation."

363.    On the call, Byrne sought to assuage concerns regarding the continued viability of the project.  Byrne misleadingly described progress being made on the project and referred to photographs of the construction site to show work that had been completed.  Byrne misleadingly stated:  "As you can see, we've made significant progress in just under 14 months."  Byrne failed to disclose that the project had fallen even further behind schedule during the past year.

364.    Byrne also provided false and misleading information about the status of the project

schedule and the receipt of production tax credits when he answered questions from analysts.  For example, Byrne had the following discussion with one analyst:

> Analyst:   When do you have to get them in service to ensure you qualify both for the production tax credits and for bonus depreciation?  And does that date differ for either of those?
>
> Byrne:    Well, Michael, this is Steve.  For the production tax credit basis, we have to have them operating by 2021.
>
> ****
>
> Analyst:   Okay.  So in the situation, they're already pushing Unit 3 out, assuming be [sic] schedule they submitted holds and what's in the BLRA filing, assuming Unit 3 is December 2020,  if that pushes out another couple of months, sometime between now and then, it's conceivable that unit wouldn't qualify for PTC?
>
> Byrne:    That possibility exists.  There are a couple things that are yet undefined relative to – or untested relative to qualification for production tax credits.  One is, what is the definition of in service, because certainly we'll be making some power from those units prior to declaring it in service.  So if making power qualifies, then we'll be ahead of those dates.  So that just gives us a little bit more room on the order of two months.

365.    Byrne had the following discussion with another analyst:

> Analyst:   Okay.  It doesn't sound like any of this stuff is insurmountable.  It sounds like blocking and tackling.  So am I correct in assuming that you guys feel like efficiency improvements are readily achievable?
>
> Byrne:    Yes.  I think the improvements that they've laid out to us.  Now, they've

got to go out and get the expertise they're talking about.  I know they're at it right now.  They're looking at all kinds of options, and we are encouraging [sic] to include all kinds of options, including the possibility that we'll have Toshiba resources on the site."

366.    Another analyst asked Byrne:  "Given the new timelines released, obviously, recently what's your level of confidence against these timelines, particularly given some of the risks around further delay on the second [new] unit [Unit 3]?  Do you have any sense on that?"

367.    Byrne responded:  "Yes.  So what we've seen so far is that the efficiency factors have increased significantly on Unit 3, our second new unit.  In some cases it's a matter of hours, in other cases, it's double or triple the efficiency factor for the second unit . . . and it's going much, much more smoothly.  So I have reasonable confidence in the efficiency gains for the second new unit."  By "efficiency gains," Byrne was referring to improving the rate of construction for Unit 3.  Byrne failed to disclose, however, that Unit 3 still would not be completed in time to qualify for the production tax credits.

368.    Marsh did not correct any of Byrne's false and misleading statements on the call.  Instead, Marsh also sought to reassure investors by misleadingly stating that "we still anticipate completing our two new nuclear units, which will enable us to provide our customers with safe, reliable energy for decades to come. . . . As you can see from Steve [Byrne's] update, we are making substantial progress on these new plants and remain focused on continued progress toward their completion."

369.    SCANA posted the transcript from the earnings call on its website along with a PowerPoint presentation that included "revised in-service dates" of "April 2020 and December 2020 for Unit 2 and Unit 3, respectively."  In addition, investors were allowed to listen to the call.

370.    On February 24, 2017, SCANA filed a Form 10-K with the SEC that failed to disclose the true status of the expansion project.

371.    SCANA's Form 10-K misleadingly stated:  "Based on current tax law and the contractual guaranteed substantial completion dates (and the recently revised forecasted dates of completion) provided above [April 2020 and December 2020], both New Units would be operational and would qualify for the nuclear production tax credits; however, any further delays in the schedule or changes in tax law could adversely impact these conclusions."

372.    SCANA's Form 10-K omitted a fair and full description of the status of the nuclear expansion project, including the unreliability of the schedule and the serious doubts about the new units qualifying for the production tax credits.

373.    In accordance with Rule 13a-14 of the Exchange Act and Section 304 of the Sarbanes-Oxley Act, Marsh certified that he had reviewed the periodic filing and that it contained no untrue statements.  Marsh knew, however, that his certification was false and misleading.

374.    Byrne also knew that the information in SCANA's periodic filing was false and misleading.  Nevertheless, on February 24, 2017, Byrne signed a sub-certification letter in connection with the filing that falsely stated he had "no knowledge of any fraud or suspected fraud affecting SCANA or SCE&G[.]"  SCANA required this sub-certification before filing the Form 10-K.

**Defendants Continue Making False and Misleading**
**Statements as SCANA Abandons the Project**

375.    On March 29, 2017, Westinghouse filed for bankruptcy.

376.    That same day, Marsh and Byrne spoke on an analyst call regarding the project and Westinghouse's bankruptcy announcement.  Marsh began by falsely stating:  "We've been transparent on this project since day one and we're not going to change that."

377.    Marsh went on to say that work would continue on the project during a 30-day transition and evaluation period and that "construction at the site will continue toward completion of the units, with approximately 5,000 workers on site daily."  Marsh also stated that "[a]t this time, we expect that the resources available from Westinghouse and Toshiba, including its parental guarantee, are adequate to compensate us for the Westinghouse estimate of additional cost."

378.    On the call, Byrne also falsely stated that going forward productivity should increase at the construction site and that there was "no change" to the latest schedule, even though Byrne knew that the schedule was unreliable and the lead contractor was entering bankruptcy.

379.    Two weeks later, on April 12, 2017, Marsh and Byrne provided an *ex parte* briefing to the PSC.  Marsh and Byrne both sought to allay concerns over the continued viability of the project.  In particular, Byrne testified that "in spite of the bankruptcy, work continues on-site without substantial disruption."

380.    Marsh and Byrne also told the PSC that SCANA was evaluating how to proceed, including whether to complete both new nuclear units, complete only one of the new nuclear units, or abandon the project.

381.    On April 27, 2017, Byrne participated in SCANA's first quarter earnings call. Byrne spoke about progress being made on the project, referring to several photographs of the construction site to show Unit 2 and Unit 3 being closer to completion, and he noted that "productivity is largely unchanged."  Byrne reiterated that they thought the cost to complete Unit 2 and Unit 3 would be covered by Westinghouse and Toshiba (through its parental guarantee). Byrne also noted that SCANA planned to extend its evaluation period by an additional sixty days.

382.    SCANA posted the transcript from the earnings call on its website.  In addition, investors were allowed to listen to the call.

383.     Based on its evaluation of the project, SCANA determined that it would take several more years and require substantial additional funding to complete Unit 2 and Unit 3. SCANA also determined that neither new nuclear unit would be completed in time to qualify for the production tax credits.

384.     On July 12, 2017, Santee Cooper's Senior Vice President for Nuclear Energy sent a letter to Byrne that expressed "significant concerns with the estimate" for completing the project. Specifically, Santee Cooper thought that even SCANA's revised estimated cost and completion schedule "could be understated by an order of magnitude – one billion dollars low and 18 months short[.]"  In sum, Santee Cooper thought that SCANA's cost and schedule estimates were "unrealistic."  Marsh and Byrne received a copy of the letter on July 13, 2017.

385.     On July 31, 2017, SCANA announced that it was abandoning the nuclear expansion project at V.C. Summer.  SCANA publicly stated that even if the project went forward Unit 2 would not be in service until December 2022 and Unit 3 would not be in service until March 2024 – *i.e.*, years after the deadline for receiving the production tax credits.  In addition, SCANA announced that the cost of completing the new nuclear units "materially exceeded" the amount of Toshiba's parental guarantee and the amount authorized by the PSC.

386.     On August 1, 2017, SCANA filed a petition with the PSC in which the company announced its intention to abandon the project.  In its petition, SCANA stated that it would cost $8.8 billion to complete the new nuclear units, and that Unit 2 would not be complete until December 31, 2022, and Unit 3 would not be complete until March 31, 2024.  In its petition, SCANA requested that the PSC find its decision to abandon the project to be "reasonable and prudent."

387.     On August 1, 2017, Marsh and Byrne testified before the PSC.  Byrne inexplicably

claimed that "[t]he construction work at the site has been progressing well," even though the project had essentially collapsed. Later in his testimony, however, Byrne acknowledged that neither Unit 2 nor Unit 3 would be completed before the January 1, 2021 deadline for receiving the production tax credits.

388. In September 2017, the Governor of South Carolina – who had obtained a copy of Bechtel's Final Report from Santee Cooper – ordered that Bechtel's Final Report be made public. The report was made publicly available over the objection of SCANA.

389. Later in September 2017, SCANA's senior management, including Marsh and Byrne, testified before the South Carolina House Utility Ratepayer Protection Committee. Marsh and Byrne acknowledged in their testimony that the concerns raised by Bechtel in October 2015 had also been raised internally by SCANA's nuclear team. Yet, neither Marsh nor Byrne publicly disclosed that information in 2015 or 2016. To the contrary, Marsh and Byrne consistently contradicted those findings in their public statements about the project. Even in September 2017, Marsh and Byrne misleadingly claimed that SCANA would still be building Unit 2 and Unit 3 if Westinghouse had not declared bankruptcy. In fact, SCANA and its senior management, including Marsh and Byrne, knew before Westinghouse declared bankruptcy that the project schedule was unreliable and that the new nuclear units would not be completed in time to qualify for the production tax credits.

390. In addition, Marsh falsely testified before the South Carolina Senate's Nuclear Project Review Committee that the schedule SCANA submitted to the PSC "was appropriate based on the facts we knew at the time" and that SCANA "never gave [the PSC] a schedule that we didn't believe in."

391. At around this time, SCANA's market capitalization had decreased to

approximately $7 billion.

392.    SCANA's false and misleading statements regarding the nuclear expansion project at V.C. Summer caused substantial losses to SCANA's investors and customers.  Investors were misled about the true status of the project at the time they invested in SCANA.  These investors lost hundreds of millions of dollars as a result of SCANA's fraud.  In addition, SCANA's energy customers lost well over $1 billion in higher rates that SCANA had been allowed to charge them to help recoup the significant financing costs associated with the project.

393.    Marsh and Byrne both resigned from SCANA at the end of 2017.

394.    On January 14, 2019, the PSC ruled that SCANA had acted imprudently from March 12, 2015 forward by misleading the PSC, ORS, the public, and investors regarding the true condition of the V.C. Summer expansion project and by failing to disclose the existence and content of the Bechtel assessment.

395.    The new nuclear units at V.C. Summer remain unfinished.

## COUNT I – FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]
### (Against All Defendants)

396.    Paragraphs 1 through 395 are re-alleged and incorporated herein by reference.

397.    Defendants, acting with scienter, in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, employed a device, scheme, or artifice to defraud.

398.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II – FRAUD

**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(2) and (3)]**
**(Against All Defendants)**

399.    Paragraphs 1 through 395 are re-alleged and incorporated herein by reference.

400.    Defendants, acting knowingly, recklessly, or negligently in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly, (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) engaged in transactions, practices, or a course of business which operated or would have operated as a fraud or deceit upon the purchaser.

401.    By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

**Violations of Section 10(b) of the Exchange Act**
**and Rules 10b-5(a), (b), and (c) thereunder**
**[15 U.S.C. § 78j(b), 17 C.F.R. §§ 240.10b-5(a), (b), and (c)]**
**(Against All Defendants)**

402.    Paragraphs 1 through 395 are re-alleged and incorporated by reference herein.

403.    Defendants, acting with scienter and in connection with the purchase or sale of securities and by the use of any means or instrumentality of interstate commerce or by use of the mails or any facility of any national securities exchange, directly or indirectly, (a) employed a device, scheme, and artifice to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and (c) engaged in acts, practices, or a course of business which operated or would have operated as a fraud or deceit upon sellers, purchasers, or prospective purchasers of securities.

404.    By engaging in the conduct described above, Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c) thereunder [15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5].

## COUNT IV – AIDING AND ABETTING (FRAUD)

**Aiding and Abetting Violations of Section 17(a) of the Securities Act**
**[15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act**
**[15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b), and (c) thereunder**
**[17 C.F.R. §§ 240.10b-5(a), (b), and (c)]**
**(Against Defendants Marsh and Byrne)**

405.    Paragraphs 1 through 395 are re-alleged and incorporated by reference herein.

406.    As alleged above, SCANA violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

407.    Defendants Marsh and Byrne knew, or recklessly disregarded, that SCANA's conduct was improper and knowingly rendered to SCANA substantial assistance in its illegal conduct as described above.

408.    By reason of the foregoing, Defendants Marsh and Byrne aided and abetted violations of and, unless enjoined, will continue to aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

## COUNT V – REPORTING PROVISIONS VIOLATIONS

**Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)]**
**and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20,**

**240.13a-1, 240.13a-11, and 240.13a-13] by SCANA and SCE&G,
and Aided and Abetted by Marsh
(Against Defendants SCANA Corporation, SCE&G, and Marsh)**

409.     Paragraphs 1 through 395 are re-alleged and incorporated herein by reference.

410.     Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. § 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13], require issuers of registered securities to file with the Commission factually accurate quarterly, annual, and current reports.

411.     As described above, Defendants SCANA and SCE&G violated, and unless enjoined will continue to violate, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, by filing quarterly, annual, and current reports that were materially false and misleading, and failed to include, in addition to the information expressly required to be stated in such reports, such further information as was necessary to make the statements made, in light of the circumstances in which they were made, not misleading.

412.     Defendant Marsh aided and abetted SCANA Corporation's and SCE&G's violations of Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder by knowingly or recklessly providing substantial assistance to SCANA Corporation and SCE&G in its violations of those provisions, and unless enjoined Defendant Marsh will continue to aid and abet violations of Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

## COUNT VI – FALSE CERTIFICATIONS

**Violations of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]
(Against Defendant Marsh)**

413.     Paragraphs 1 through 395 are re-alleged and incorporated herein by reference.

414.     Exchange Act Rule 13a-14 requires an issuer's principal executive and financial officer to certify in each quarterly and annual report filed or submitted by the issuer under Section

84

13(a) of the Exchange Act that: (1) they have reviewed the report; and (2) based on their knowledge, the report does not contain any untrue statement of material fact, or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report.

415.    Marsh signed and submitted the required certifications in this case in connection with SCANA Corporation's and SCE&G's filings with the Commission as described above. Marsh's certifications, however, contained untrue statements of material fact and also omitted to state material facts necessary to make the statements he made therein not misleading.

416.    By reason of the foregoing, Marsh violated and, unless enjoined, will continue to violate Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## PRAYER FOR RELIEF

The Commission respectfully requests that this Court:

1.    Find that Defendants committed the violations alleged herein;

2.    Permanently enjoin Defendants and each of their agents, employees, and attorneys, and any other person or entity in active concert or participation with him who receives actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in conduct in violation of, as appropriate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]; and Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, 13a-13, and 13a-14 thereunder [17 C.F.R. § 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.13a-14].

3.    Order Defendants to disgorge all ill-gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint, plus pay prejudgment

interest;

4.      Order Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] in an amount to be determined by the Court;

5.      Issue an Order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], and the inherent equitable powers of this Court, prohibiting Defendants Marsh and Byrne from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act;

6.      Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court; and

7.      Order such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## **JURY TRIAL DEMAND**

The Commission demands a trial by jury on all issues that may be so tried.


Dated: February 27, 2020          Respectfully submitted,

                                  Nathan S. Williams
                                  Attorney for the United States

Acting Under Authority Conferred by 28 U.S.C. § 515

By: /s/ Beth C. Warren
JAMES LEVENTIS (#9406)
BETH C. WARREN (#11360)
Assistant United States Attorneys
1441 Main Street, Suite 500
Columbia, South Carolina 29201
Telephone (803) 929-3037
E-mail: beth.c.warren@usdoj.gov

M. Graham Loomis*
Harry B. Roback*
John O'Halloran*
U.S. Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
(404) 942-0690 (Roback)
robackh@sec.gov

*Application for admission *pro hac vice* forthcoming